JOSEPH A. VENETO *vs.* McCLOSKEY & Co. & another.

Suffolk.    December 6, 7, 1954. — July 18, 1955.

Present: QUA, C.J., WILKINS, SPALDING, & WILLIAMS, JJ.

*Contract,* Building contract, Performance and breach, Modification, Consideration. *Payment. Surety. Bond,* Contractor's bond. *Damages,* For breach of contract, For breach of bond.

Findings by a master in a suit in equity by a subcontractor against the general contractor on a building construction project justified a conclusion that the plaintiff was in default under the subcontract for failure to comply with its terms requiring the plaintiff to make prompt payment for materials and labor and to submit to the defendant satisfactory evidence of payment of indebtedness. [99]

The mere fact that during the progress of a building construction project the subcontractor under a subcontract for excavation work, which did not specify any particular method of excavating rock, adopted a change in the method of excavating rock did not furnish consideration for a promise then made to him by the general contractor to increase the unit price previously set by the subcontract for rock excavation; the general contractor's promise was gratuitous and there was no modification of the subcontract with respect to the unit price. [100–101]

A computation of periodic amounts earned by a subcontractor on a building construction project, made by a master on the basis of percentage of completion of the subcontractor's work, was incorrect where the subcontract provided for payments to the subcontractor on the basis of amounts allowed by the architect for "the value and amount of work" done. [102–103]

An overpayment by a general building contractor to a subcontractor of an amount small in comparison to the amount to which the subcontractor was entitled and the total amount of the subcontract did not materially increase the risk of the compensated surety on the subcontractor's performance bond and released the surety from liability to the general contractor only to the extent of the overpayment. [104]

An alleged denial in a monthly estimate of credit to a building subcontractor for certain work done did not result in an underpayment to him where payment for such work would not have been due under the subcontract until a certain date which was after he had become in default, and the subcontract provided that in case of his default he should not be entitled to receive any further payment until the work was wholly finished. [104]

After a building contractor and a subcontractor had agreed upon a breakdown of a lump sum subcontract price into specified amounts

allocated to the various items of the subcontractor's work, departures by them from the breakdown in calculating payments to be made to the subcontractor did not release the surety on the subcontractor's performance bond from liability to the contractor where it appeared that the breakdown related to internal pay control only, did not need approval by the surety, and could be changed by the contractor and the subcontractor at any time.  [105]

A subcontractor on a building construction project for the United States whose subcontract with the general contractor provided that the subcontractor would "promptly pay any and all sum or sums of money due by him for labor and/or materials" furnished for the work, and the surety on a bond furnished by the subcontractor to the contractor conditioned on the subcontractor's performance of the subcontract and "payment for labor performed or furnished and materials used in the performance thereof," were liable to the contractor for an amount which the contractor was required to pay in satisfaction of judgments recovered against him in a Federal court by unpaid furnishers of labor and materials for the subcontractor's work; a provision in the bond that it was "in accordance with" G. L. (Ter. Ed.) c. 149, § 29, was an inadvertence and inapplicable in a bond furnished in connection with a Federal project and might be treated as surplusage.  [105–106]

The amount of damages for which a subcontractor was liable to the general contractor on a building construction project upon default by the subcontractor and completion of his work by the contractor was the excess of the amount expended by the contractor to complete the work over the amount which he would have had to pay the subcontractor under the subcontract if there had been no default.  [107]

The liability of the surety on a bond given for performance of a building contract was limited to the amount of the bond, even though the obligee sustained damages from default under the contract in excess of the amount of the bond.  [107]

BILL IN EQUITY, filed in the Superior Court on August 14, 1950, against McCloskey & Co. and J. F. White Contracting Company.

The suit was referred to a master.  The plaintiff and the defendant McCloskey & Co. appealed from interlocutory decrees entered by *Morton*, J., and from the final decree entered by *Kirk*, J.  The American Fidelity Company, ordered to intervene in the suit, appealed from the final decree.

*Francis D. Branca*, (*Frank Mulready* with him,) for the intervener.

*Frank P. Hurley*, for the plaintiff.

*Vincent R. Brogna*, (*Maxwell McConnell & J. Dress*

*Pannell* of Pennsylvania, with him,) for the defendant McCloskey & Co.

SPALDING, J. McCloskey & Co. (hereinafter called McCloskey), a Delaware corporation engaged in the business of erecting buildings, and the United States of America entered into a written agreement on February 15, 1950, whereby McCloskey was to construct a one thousand bed veteran's administration hospital in Boston for a lump sum of $10,563,000 subject to increase or decrease by virtue of the operation of the unit prices for rock excavation and concrete as set out in the contract. McCloskey and Joseph A. Veneto (hereinafter called Veneto), an earth removal contractor in the Boston area, entered into a written contract on February 15, 1950, whereby Veneto agreed to perform all the work specified in the McCloskey-United States contract with respect to site preparation and demolition; excavation, filling, and backfilling for building construction; excavation, trenching, and backfilling for utilities systems; site grading and excavation, for a lump sum of $157,500 subject to increase or decrease by virtue of the operation of a unit price of $4 per cubic yard for rock excavation as set out in the contract.[1] Veneto also agreed to furnish a surety bond guaranteeing completion of the work and payment of all bills for material and labor. On February 23, 1950, Veneto as principal and the American Fidelity Company as surety executed a bond for the faithful performance of the contract in the amount of $157,500.

Veneto commenced work under his contract with McCloskey within a few days after its execution, but on March 1, 1950, his power shovel operators were ordered off the job by union officials for the reason that Veneto had no contract with the union and was therefore not an approved contractor. As a result Veneto was forced to stop work. He then

---

[1] The unit price for rock excavation was to become operative by reference to the specifications of the prime contract, after 12,000 cubic yards of rock had been excavated for building construction, 550 cubic yards for utilities installation, and 1,200 cubic yards for site grading, or 13,750 cubic yards all told.

made a contract dated March 17, 1950, with J. F. White Contracting Company (hereinafter called White), which had previously been Veneto's subcontractor, whereby White agreed to perform the excavation, filling, and backfilling for building construction; excavation, trenching, and backfilling for utilities system; and site grading and excavation. Veneto agreed to supply all trucks necessary for the work and all the earth fill required for backfilling and grading. White was to be paid the actual net cost of the work plus a profit of ten per cent. The contract further provided for payment to White directly by McCloskey, such payments to be made on or before the fifteenth of each month in an amount equal to the actual net cost shown by White's statement submitted on the twenty-fifth of the preceding month. McCloskey agreed in writing to be bound by the contract, and the surety assented.

This suit arises out of the Veneto-McCloskey contract. McCloskey held Veneto in default of the contract and, after the surety declined to complete performance, McCloskey took possession and completed the work. Veneto alleges that he was improperly defaulted and that money is due him under the contract. McCloskey denies that anything is due Veneto, and counterclaims for the cost of completion of the contract after default. The American Fidelity Company (hereinafter called the surety) was ordered to intervene.

A master, to whom the case was referred, submitted a report. Veneto, the surety, and McCloskey all filed objections to the report. McCloskey and Veneto made motions to recommit to the master, but the court denied the motions. McCloskey appealed from the denial of its motion to recommit. The exceptions to the master's report were overruled and the master's report was confirmed. From the interlocutory decree confirming the report McCloskey and Veneto appealed. A final decree was entered dismissing Veneto's bill with costs, dismissing White's counterclaim (with which we are not concerned since White did not appeal), and ordering Veneto to pay McCloskey on its counterclaim the sum of $133,248.42 and interest in the sum of

$24,348.18, or a total of $157,596.60 together with costs. The surety was ordered to pay a like amount. The indebtedness of Veneto and the surety was joint and several. Veneto, McCloskey, and the surety appealed.

### VENETO'S APPEAL.

The master found that Veneto was properly defaulted by McCloskey. This conclusion is amply supported by the subsidiary findings. Article V of the Veneto-McCloskey contract provided that Veneto's failure to make prompt payment for materials or labor furnished for the work or failure to submit satisfactory evidence of payment of all indebtedness included in any previous monthly statement would give McCloskey the right, on two days' written notice to Veneto, to terminate the employment, take possession of the tools and appliances, and complete the work. On June 30, 1950, McCloskey sent a letter to Veneto requesting that he furnish within two days satisfactory evidence of payment of all indebtedness which had been included in any previous monthly statement; the letter further stated that upon Veneto's failure to comply with the request McCloskey would be at liberty to exercise its rights and remedies under the contract. The master found that Veneto never replied and that on June 30 he owed trucking bills amounting to at least $7,344.44 which had been included in previous monthly statements. He made no finding that money was due Veneto from McCloskey at the time the trucking bills were due and payable. (It will appear under the discussion of the surety's appeal that McCloskey may have paid out less than it owed for the cumulative May estimate of Veneto which included White's costs but it does not appear that anything was owed to Veneto.) On July 11, McCloskey sent a letter to Veneto (sending copies to the surety and White) stating that Veneto was in default of his contract for, among other things, having failed to pay for labor, material, and equipment or submit any satisfactory evidence of payment.

Veneto argues the denial of his motion to recommit, but since he took no appeal therefrom the question is not open. *Proctor* v. *Norris*, 285 Mass. 161, 164.


## THE SURETY'S APPEAL.

The surety in this case appeals essentially on two grounds: first, the contract between Veneto and McCloskey was modified by the increase to $8 of the unit price for excess rock excavation, and secondly, the basis and methods of payment under the contract were materially altered by McCloskey.

The master found that whatever rights the surety had against McCloskey, including such rights as arose out of the terms of the Veneto-McCloskey contract of February 15, 1950, and the White-Veneto contract of March 17, 1950, have never been waived or abandoned. He made no finding as to whether the surety was released from its obligations because of any act of McCloskey. The final decree indicates that the court considered that there was no total release of the surety.

The master found that the Veneto-McCloskey contract was modified on or about May 2, 1950, by McCloskey's increasing the unit price for excess rock excavation from $4 to $8 less certain charges in consideration of Veneto's agreement to excavate rock by a trench rock method rather than a shaft rock method. This finding is challenged by McCloskey. At McCloskey's request the master in his supplemental report summarized the evidence on which this finding was based, as follows: "Both Harney [Veneto's representative] and . . . [Veneto] testified the $8 offer was made in March, 1950, in connection with taking on White as subcontractor. McCloskey testified it was made on May 2, 1950, because . . . [Veneto] was losing money on rock excavation. Brenner [McCloskey's representative] testified it was made on May 2, 1950, in connection with his refusal to approve the April estimate. Lawry [White's subcontractor for blasting] testified that the trench method

was first proposed April 25, 1950; both Brenner and Lawry testified McCloskey & Co. desired the plan adopted, and Lawry testified that it was adopted early in May, 1950, and committed to writing May 10, 1950, as evidenced by the writing of that date." The writing referred to was one made up by Lawry reducing the plan to excavate trench rock to writing by identifying specific locations where such trench rock would occur and the plan was accepted by Harney at that time.

We are of opinion that the summary of the evidence does not afford a basis for the conclusion that the change in method of blasting was the agreed exchange for the promise of $8. No method of blasting was specified in the contract and Veneto would have been within his rights by employing either or both methods. Thus the fact that he adopted the trench method does not without more indicate that his doing so was consideration for the payment of $8. The promise, therefore, to pay the additional price for rock removal was gratuitous and did not constitute a modification of the contract.

We pass now to the matter of the payments made to Veneto or on his behalf by McCloskey before the default. It is the position of the surety that these payments departed from those prescribed by the contract to an extent sufficient to release it from all liabilities on the bond. The master found that as of May 25, 1950, Veneto had earned no more than $122,781 and, with ten per cent retained by McCloskey, was entitled to $110,502.90. But there had been paid to Veneto and White $141,126.93 for this work, which resulted in an overpayment of $30,624.03. This was computed, at least partially, on a percentage of completion basis. It is the surety's contention that this overpayment was prejudicial because it diminished unduly the amount available to pay for the work still remaining.

Article IX of the Veneto-McCloskey contract provides that the principal sum of $157,500 "shall be paid on the same basis and subject to the same terms and conditions as are provided for payment to . . . [McCloskey] of the con-

tract price stipulated in" the McCloskey-United States contract. Article IX continues: "On the 25th day of each month . . . [Veneto] shall submit to . . . [McCloskey] an itemized estimate of the value and amount of work completed . . . during the then current month, and on or about the 15th day of the following month . . . [McCloskey] shall pay to . . . [Veneto] Ninety (90%) percent of the amount allowed therefor by the Architects, when and as payment thereof shall be made" by the United States to McCloskey.

Article 16 of the McCloskey-United States contract provides that "(a) . . . partial payments will be made as the work progresses at the end of each calendar month . . . on estimates made and approved by the Contracting Officer. In preparing estimates the material delivered on the site and preparatory work done may be taken into consideration. (b) In making such partial payment there shall be retained 10 per cent on the estimated amount until final completion and acceptance of all work covered by the contract; provided, however, That the contracting officer, at any time after 50 percent of the work has been completed, if he finds that satisfactory progress is being made, may make any of the remaining partial payments in full . . . ."

Neither contract specifies percentage of completion as a basis for payment. The McCloskey-United States contract does not specify any basis other than ninety per cent of the estimates approved by the contracting officer. The Veneto-McCloskey contract, however, specifies payment on the basis of ninety per cent of the amount allowed by the architects for "the value and amount of work" done. Substantially similar wording has been interpreted to mean payment on the basis of value of the work done rather than percentage of completion. *Finney* v. *Condon*, 86 Ill. 78, 82. *British American Tobacco Co. Ltd.* v. *United States Fidelity & Guaranty Co.* 177 App. Div. (N. Y.) 582. *Hastings Land Improvement Co.* v. *Empire State Surety Co.* 156 App. Div. (N. Y.) 258, affirmed 215 N. Y. 653. We are therefore of opinion that the percentage of completion basis used by the

master to determine $122,781 as the amount earned under the Veneto-McCloskey contract was incorrect because it was not the basis of payment upon which the surety guaranteed Veneto's performance. There is no finding that the payments were excessive tested by the basis set forth in the contract, namely, the "value and amount" of work done.

We are concerned solely with the master's findings as to the value of the work done by Veneto and the payments made by McCloskey to Veneto or on his behalf. The surety does not claim that any of these amounts paid by McCloskey were in excess of the amount of money allowed by the architects under the contract. The pertinent figures are those showing the value of work done up to May 25 and the amounts paid up to the date of default, July 14. The value of work performed after May 25 appeared on the June 25 estimate and sums due thereunder did not become payable until July 15, which was subsequent to the date of default.

The master also found that on another view of the facts there had been an overpayment of at least $4,032.23. He computed this on the basis of $158,522 earned as of June 25 less retained percentage, leaving $142,669.80. From this figure the master deducted $5,575.10 which was due from Veneto to McCloskey. Inasmuch as the amount actually paid was $141,126.93 the alleged overpayment would be $4,032.23. These figures conflict with findings previously made by the master. In paragraph 20 he found the value of work as approved on May 26 was $158,522 and this figure corresponds to the master's findings as to the estimates submitted through May 25. Moreover the $5,575.10 related to an item in the June estimate and obviously was not deductible from the amount through May which, as pointed out above, is the period with which we are concerned. Thus on a correct view of the facts $158,522 had been earned and $142,669.80, without the deduction of $5,575.10, was due on the entire contract through the May 25 estimate. Hence the finding of overpayment on the entire contract in the amount of $4,032.23 was error.

However, although there was no overpayment on the

entire contract, there was a payment to Veneto of $1,422.75 in excess of what he was entitled to receive.[1] This overpayment did not materially increase the risk and releases the surety only pro tanto. The surety is a compensated surety and is not entitled to invoke the ancient doctrine of strictissimi juris. It has generally been held that an overpayment of the sort here involved will not operate as a general release of such a surety. See *Museum of Fine Arts* v. *American Bonding Co.* 211 Mass. 124; *Guild* v. *Butler*, 127 Mass. 386, 389; *Moore* v. *Maryland Casualty Co.* 12 Fed. Sup. 90, affirmed sub nomine *Maryland Casualty Co.* v. *Moore*, 82 Fed. (2d) 189 (C. C. A. 1), certiorari denied 298 U. S. 666; *Maryland Casualty Co.* v. *Eagle River Union Free High School District of Vilas County*, 188 Wis. 520, 526; *Phillips* v. *American Liability & Surety Co.* 309 Pa. 1, 9–10; *New York Municipal Railway* v. *Intercontinental Construction Corp.* 115 Misc. (N. Y.) 341, 345–346, affirmed 200 App. Div. (N. Y.) 871; Restatement: Security, §§ 128 (b) (ii), 132 (a); Simpson, Suretyship, §§ 74, 78.

The surety also argues that it was entitled to be released because there were underpayments on rock items. This contention is without merit. The underpayments are claimed as a result of changes made in the June estimate whereby Veneto was denied credit for certain amounts of rock excavated. These amounts would not have become due until July 15. Hence whatever amounts were earned before the date of default, but became due thereafter, are immaterial, since article V of the contract provides that in case of default Veneto shall not be entitled to receive any further payment under the contract until the work shall be wholly finished. There was, therefore, no underpayment. This conclusion makes it unnecessary to decide to what extent, if any, the surety would have been relieved had there been an underpayment.

---

[1] This overpayment is arrived at as follows: From $142,669.80, which was the amount payable on the contract after retaining Veneto's ten per cent, should be subtracted $99,656.21, the total of White's estimates including his ten per cent. This leaves a balance of $43,013.59 which was payable to Veneto. Veneto was paid $44,436.34 which is $1,422.75 more than he was owed.

The surety further contends that the payments did not conform to the breakdowns agreed upon by McCloskey. The master found that whatever rights the surety acquired against McCloskey arising out of the contract breakdowns had never been waived or abandoned. He further found on this issue the following: "In order for monthly progress payments to be made by . . . [McCloskey] in accordance with the contract . . . it was necessary for . . . [Veneto] and an implied term of the contract to submit to . . . [McCloskey] a breakdown of his contract bid, showing his allocation of the lump sum promised him in the contract to the various work items to be performed by him. Since the purpose of preparing such a breakdown was for pay control, there was no need that the itemized proportion of money to work performed be absolutely accurate, but merely that the allocations of money to each work item be within reason; thus, even though excessive or insufficient funds might be allotted to one particular part of the job, at the completion of all the work payment of the entire sum due under the contract would have been made, no more, no less." Early in April a breakdown schedule was agreed to. And a modification of this schedule was agreed upon in May.

We are of opinion that such departures as there were from the breakdowns agreed upon by Veneto and McCloskey did not affect the rights of the surety. The breakdown at most related to internal pay control only and was merely for the convenience of the contracting parties. There was no necessity under the contract for the surety's approval of any breakdown and from all that appears the breakdown could have been changed by agreement of Veneto and McCloskey at any time. The surety shows no basis for release on this ground.

By virtue of U. S. C. (1946 ed.) Title 40, §§ 270a–270d (the "Miller Act"), McCloskey was required to furnish a bond for the protection of "all persons supplying labor and material in the prosecution of the work" provided for under its contract with the United States. Certain of Veneto's

subcontractors who had furnished labor and materials for the job for which they had not been paid obtained judgments in the Federal court against McCloskey in the amounts of $6,199.37 and $10,316.01. These judgments together with a master's fee of $183.09, which the court ordered McCloskey to pay, amount to the sum of $16,698.47 and have been paid. The master found that this amount was owed to McCloskey by Veneto and the surety. We are of opinion that both the plaintiff and the surety are liable for this amount. The surety's bond, it is true, does not refer specifically to liability for such judgments, but failure to pay the labor and material bills was a default on the part of Veneto which resulted in expense to McCloskey. Under article IX of his contract, the faithful performance of which was secured by the bond, Veneto agreed to "promptly pay any and all sum or sums of money due by him for labor and/or materials." The surety seeks to escape liability for the judgments in the Federal court on the ground that the bond referred not to the Miller act but to G. L. (Ter. Ed.) c. 149, § 29.[1] There is no merit in this contention. The reference to G. L. (Ter. Ed.) c. 149, § 29, was clearly inapplicable to a contract for work on a Federal project and undoubtedly resulted from the use of a form prepared for a contract with a city, county, or town. Apart from the reference to § 29, which is to be treated as surplusage, the terms of the bond are sufficiently comprehensive to include the Federal judgments.

The master found that McCloskey had made advance payments to White and his subcontractor to meet payrolls on four occasions in the total amount of $8,200 and that the surety had not assented to these advances. But elsewhere in the report it appears that these sums were part of the

---

[1] The condition of the bond was, "Now, therefore, the condition of the above obligation is such, that if the above bounden Principal shall faithfully perform the said contract in accordance with its terms and conditions and shall make payment for labor performed or furnished and materials used in the performance thereof in accordance with the provisions of Chapter 149, Section 29 of the General Laws of The Commonwealth of Massachusetts, and all Acts amendatory thereof or supplementary thereto, then this obligation shall be null and void, otherwise to be and remain in full force and effect."

$142,669.80 which as of May 25 Veneto and White had earned. Hence there was in fact no overpayment.

## McCloskey's Appeal.

The principal questions raised by McCloskey's appeal have already been discussed in considering the appeal of the surety. Primarily they have to do with the amount due it from Veneto and the surety.

## The Decree.

The total amount expended by McCloskey to complete the work included in the contract was $367,571.78.[1] Under the contract McCloskey would have had to pay Veneto $199,503.26.[2] The difference between this sum and the total cost of completion is $168,068.52 and that is the amount of damages for which Veneto is liable.

The surety's liability is somewhat less. As pointed out above it is entitled to be released in the amount of $1,422.75 for overpayments to Veneto. Deducting this sum from $168,068.52, the amount of Veneto's damages, would leave $166,645.77. But the surety's liability is limited to the amount of the bond $157,500 plus interest and costs. See *Union Market National Bank* v. *Nonantum Investment Co.* 291 Mass. 439, 444.

The interlocutory decrees are affirmed. The final decree should be modified to show an assessment of damages

---

[1] This is made up of the following:

| | |
|---|---|
| $141,126.93 | paid before default to Veneto and White |
| 96,985.37 | paid to White July 15 to August 15 |
| 103,836.80 | paid to Kennedy |
| 8,924.21 | for work done by McCloskey which Veneto agreed to pay for because it was work which he was obligated to do under the contract |
| 16,698.47 | paid to satisfy Federal Court judgments and master |

Total $367,571.78

[2] This figure is arrived at as follows:

| | |
|---|---|
| $157,500.00 | the contract price |
| 40,395.20 | increase for rock removal in excess of contract estimate |
| 1,608.06 | for sale of boiler |

Total $199,503.26

against Veneto of $168,068.52 with interest from the appropriate dates; and an award against the surety of $157,500 with interest from the appropriate dates, the liability of Veneto and the surety being joint and several to the extent of $157,500 plus interest from the appropriate dates. The final decree as so modified is affirmed. McCloskey is to have costs of appeal.

*So ordered.*