Town of East Longmeadow *vs.* Maryland Casualty
Company.

Hampden.    January 5, 1965. — April 2, 1965.

Present: Wilkins, C.J., Spalding, Whittemore, Cutter,
& Spiegel, JJ.

*Damages*, For breach of bond, Counsel fees. *Surety. Bond,* Performance bond. *Contract,* For valuation of property, Divisibility. *Payment. Words,* "Value."

A contract between an appraisal company and a town acting by its assessors calling for a professional revaluation of substantially all the property in the town and assistance in explaining the revaluation to taxpayers and in cases before the Appellate Tax Board and the courts was indivisible and entitled the town to a single complete and proper revaluation; and, where the company failed to furnish such a revaluation and abandoned the work incomplete, a provision of the contract for periodic payments to the company "for work completed" on the basis of "the value of said work" did not justify a ruling that "when payment was made . . . for each segment of the work . . . that portion of the contract was completed" and that the town could not hold the company or the surety on its performance bond for breach of the contract "relating to" that portion.   [726]

In an action by a town against the surety on a performance bond furnished by an appraisal company in connection with an indivisible contract with the town requiring the company to perform a complete and proper professional revaluation of substantially all the property in the town, although the contract provided for periodic payments to the company "for work completed . . . equivalent to the value of said work," where it appeared that the company, after receiving several periodic payments on the basis of invoices submitted by it and approved by the town's assessors, abandoned the work incomplete and so failed in performance of the contract as to justify the town in arranging for a complete new revaluation by another concern, it was held, with respect to the assessment of the town's damages, that the town as against the surety was entitled to rely on such invoices submitted by the company as properly reflecting "value" of work done and to pay the invoices without investigating their propriety, and that the payments made on them should be included in the damages.   [726–728]

A town which, through failure of an appraisal company to perform properly a contract with the town for a revaluation of the property therein, did not have the revaluation available for the assessments in certain years, suffered no loss of tax revenue thereby and was not entitled to

damages on that alleged ground in an action against the surety on a performance bond furnished by the company.  [728–729]

The plaintiff in an action on a bond was not entitled to have included in the damages counsel fees incurred by the plaintiff in prosecuting that very action.  [729]

CONTRACT.  Writ in the Superior Court dated September 22, 1960.

The plaintiff alleged exceptions after hearing and a finding by *Beaudreau, J.*

*Joseph R. Jennings,* Town Counsel, for the plaintiff.

*Albert W. Wunderly* for the defendant.

WHITTEMORE, J.  The plaintiff town had a finding of $300 and interest in this action in the Superior Court on a bond on which the defendant (Maryland) was surety conditioned on the prompt and faithful performance of a contract of National Associates, Inc. (National) with the town acting by its board of assessors.

The case was heard by a judge without jury on an auditor's report and several other exhibits, all incorporated in the record before us.

The contract dated April 28, 1959, was for the revaluation of real and personal property in East Longmeadow. The plaintiff excepted to rulings and refusals to rule and the principal issue is whether the judge was correct in holding that, in the computation of the town's damages, instalment payments to National in 1959 totalling $7,166 must be excluded.

The contract required National to complete the work by December 1, 1959, and under it National was to be paid $21,500 over a three year period.

National was last observed at work in October, 1959, and was adjudicated a bankrupt on November 16, 1959.  Its work under the contract with the town was then incomplete. On September 14, 1960, the town made an agreement with another appraising firm for a complete revaluation in the sum of $23,000 or $1,500 more than the cost to the town under National's contract.  The auditor found that of this sum $1,200 was ascribable to the cost of appraising 150 new

houses that were not in existence when the contract with National was signed. The judge found that this was a credit against the $1,500 and awarded $300 as the only damages proved.

The contract provided: "Payment shall be made for work completed semi-monthly equivalent to the value of said work but shall not be in excess in 1959 of . . . $7,166.00." National's invoices in 1959, totaling $7,166 were approved by the assessors and paid in due course as follows: (1) May 29, "Cards and Field Sheets $300, Film $420, Master Book $700, Clerical $300, Land Study $250, [Total] $1,970"; (2) June 10, "Field Work, $1,000"; (3) June 26, "Field Work, $3,500"; (4) July 20, "Field Work and Card Computation, $696."

National delivered to the assessors approximately 2,500 to 3,000 property record cards such as the contract required it to prepare. These were first delivered about August 15, 1959, were returned to National, and were redelivered about September 2, 1959. On the basis of evidence of the assessors' review of from 200 to 300 of these cards and of errors and omissions thereon, the auditor found as to all of them that the assessors were unable by the use of the cards accurately to assess the properties listed thereon. No check of National's work was made by the assessors prior to paying the four bills. In the first week of August an assessor requested samples of National's work. The assessors examined approximately 200 of the cards in September and discovered errors.[1] In connection with another issue (the town's claim of loss of taxes in 1960 and 1961), the auditor found that the cards delivered by National in August, 1959, were intended to be used by the assessors as their official records if National had completed the contract, and that the "plaintiff had a benefit conferred

---

[1] These were errors in the mathematical computation of the measurements of buildings. These resulted in other errors affecting the total assessed value. There were also errors in recording the type of construction. On some cards there was no computation of land value and, on others, no computation of building value. Some cards incorrectly reported unfinished attics or basements as finished.

upon it in August, 1959," but that there was no testimony that enabled him to find the fair value of that benefit.

The auditor found that the assessors approved the four 1959 invoices in good faith, that there was no evidence to show that "the specific items of field work or card computation or the purchase of miscellaneous items set forth in the first invoice received June 2, 1959 . . . [were] not actually performed by National." He also found that the assessors in good faith relied upon National to furnish good quality in the work being performed, that the board of assessors was composed of three part time members, that because of the extent of the revaluation work the assessors were compelled to hire a specialized company to conduct it and, due to the specialized type of work, he inferred that the assessors "were not able during these times to question the invoices presented to them." He concluded that if the court should rule that the money paid by the town to National was a proper element of recoverable damage the amount of it was $7,166.

The judge ruled that the contract provision for semimonthly payments "equivalent to the value of said work" placed upon the town some degree of reasonable diligence before making payment, and granted, "as to the surety," the defendant's request (No. 3) to rule that "[w]hen payment was made . . . for each segment of the work submitted, that portion of the contract was completed and the plaintiff could thereafter neither sue . . . National . . . for a breach of the contract relating to the portion of the contract for which it had paid nor could it sue the surety on the bond." The judge also denied requests of the town inconsistent with this granted request and the ruling noted above.

The judge found that the town acted correctly in refusing to accept Maryland's proposal to have another company, two of whose "members" had been employees of National, carry out National's contract with no additional cost to the town and under a bond to be given by Maryland and in recontracting with another concern.

The contract was not divisible. National was obliged to revalue all the real and personal property in the town except nonbusiness personal property of individuals. The contract required the revaluation of the entire town by one appraising concern; thus it would be a firm basis for uniform assessments by the assessors. Furthermore, it required that National, if requested, provide qualified persons to assist in explaining the system of revaluation to the property owners, and that National assist in defending the values as established by it including assistance in appeals before the Appellate Tax Board and the courts. Defendant's request No. 3 did not correctly state the applicable law.

The town, for its $21,500 was entitled to a single product, a single revaluation of all the property, internally consistent, submitted by an appraising company prepared and able to defend it. It did not get this, as the judge rightly recognized in his finding that the town was justified in contracting for another such appraisal.

The issue, as we view it, is thus narrowed to whether the obligee-surety relationship impliedly obligated the town not to make payments without checking National's performance as asserted in the invoices. Did the town without obligation and in violation of its duty to the surety pay out funds that would otherwise have been available to meet the cost of the new contract? See *Veneto* v. *McCloskey & Co.* 333 Mass. 95, 104 (surety released pro tanto by overpayment to contractor).

We hold that it did not. The provision that payment "shall be made for work completed semi-monthly equivalent to the value of said work" must be construed in the context of the contract.[2] The meaning of "value" is not

___

[2] The auditor found that it had first been agreed that the $7,166 to be paid in 1959 should be paid in three instalments from July 1 to December 1. The superseded provision that so provided appears in the contract, lined out. It contained the words: "provided the work performed . . . in the preceding period shall have a value of at least the equivalent of said instalment payment."

the ultimate value to the town of the separate portions of the work so far performed, separately considered. If the rest of the work were not performed that value might be little, or nothing.

We assume, however, that the intention was to have some estimate of the worth to the town of instalments of performance assuming that the entire contract would be properly carried out. See the *Veneto* case, pp. 102–103 (payment of a percentage of the amount allowed by the architect for "the value and amount of work" done means payment on basis of the value of the work rather than on percentage of completion). Our view of the case is such, however, that we need not determine how that worth or instalment "value" could be determined under such a contract, or whether it could in practice mean more than the quantity of the work properly done in proportion to the entire performance.

The work to be done was such that someone had to make the estimate of the "value" of the work. There was no provision for an independent estimate, as by an architect under a building contract. We hold for reasons to be stated that, as against the surety, the town was entitled to rely on National to make the required estimate.

There was no practical way for the town to estimate or determine the "value" of the "field work," the only work shown done in any of the invoices except the last. Only the invoice of July 20 included a charge for "Card Computation." Beyond this, however, and controlling, was the nature of the relationship between the town and National. It was such, in our view, that the town was entitled to rely on the implied representation of the invoice that work to the "value" shown had been completed both as to quantity and quality of the work. National had undertaken to render a professional service. The contract was presumably awarded after submission of the statement of qualifications, experience, financial responsibility, past work and associations called for by the specifications, and appropriate for the engagement of professional assistance. The con-

tract required that experienced and competent employees be furnished. Under such a contract the town was entitled to rely on the expectation of good and trustworthy professional performance and billing. Although the relationship was not of the confidential nature of that of a tax accountant who has prepared income tax returns, for example, there is an analogy. In neither case does the client at his own risk pay a bill for services involving hours of time, good work and accurate computations without checking that the work billed for has been correctly done.

The town, we assume, had a defence to the invoices because of inaccurate work and inadequate performance. The defence, however, did not depend on the ambiguous phrase in the contract, "value of said work." The undertaking to do the work well was express in the specifications and implicit throughout the contract. The expression "equivalent to the value of said work" did not alter the town's right as against the surety to rely on the obligations of the professional relationship and not investigate the amount and quality of the work to determine whether a defence existed. The words used were not notice to the surety that the contract required that invoices be verified before payment or that any modification of the implications of the professional relationship was intended.

The invoice of May 29 was in larger part a charge for materials to be used in the course of the revaluation. We need not decide whether payment was due for these materials before use had been made of them and they had become a part of "work completed." The materials, in substantial part, were used in connection with the work thereafter done and billed, and there is no showing of the extent to which they were unused in such work. Maryland therefore has not shown that there was an overpayment for materials which was prejudicial to it.

There is nothing in the other points referred to in the town's brief. The town suffered no loss of tax revenue in not having the revaluation for the 1960 and 1961 assessments. The town's appropriations were levied on the tax-

able property, and inequalities that might have been corrected by the revaluation did not damage the town in any way compensable in damages.

Counsel fees in this action against Maryland to recover for its breach of its obligation are not recoverable. *Donaldson* v. *Boston Herald-Traveler Corp.* 347 Mass. 274, 280–281. The auditor found that the services were rendered ''in settlement discussions with the defendant, preparation for trial, and trial of this action.'' The other minor items, summarily referred to by the town, are adequately and rightly dealt with in the judge's findings.

The exceptions are sustained. Judgment is to enter for the plaintiff for $7,466 and interest.

*So ordered.*