LEONARD BUKER & another[1] vs. NATIONAL MANAGEMENT
CORPORATION.

Hampden. February 18, 1983. — May 18, 1983.

Present: KASS, SMITH, & WARNER, JJ.

*Limitations, Statute of. Bankruptcy,* Statute of limitations. *Landlord and Tenant,* Warranty of fitness, Repairs. *Contract,* What constitutes.

A two-year statute of limitations which governed plaintiffs' claims sounding in tort was not tolled during a three-year period when their assets were under the control of a trustee in bankruptcy. [39-41]

Summary judgment was appropriately ordered for the lessor of a commercial building on its lessees' claims for breach of warranty that the building would be suitable for their commercial purposes, since an implied warranty of suitability does not arise in a commercial lease transaction and since none of the dealings between the parties, as set out in connection with the motion for summary judgment, could have created an express warranty of suitability. [41-43]

In an action by lessees of a commercial building against their lessor, there was no evidence that the lessor had made any express warranty with respect to the condition of the leased premises. [43]

Where the record in an action by the lessees of a commercial building against their lessor did not show that the lessees were entitled to rely, or did rely, on the oral promise of the lessor's representative to "work things out" with respect to repairs of the building, the lessor was not estopped to deny that the written lease, under which the lessees undertook to make repairs, was amended by the representative's statement. [43-44]

Where lessees of a commercial building assumed responsibility for maintaining the premises in good repair, failure by the lessor to make a certain repair to the heating plant, which was operative when the lessees first occupied the building, did not constitute a breach of the lessor's covenant of quiet enjoyment. [44-45]

_____

[1] Bee and Jay, Inc.

CONTRACT AND TORT. Writ in the Superior Court dated January 5, 1971.

Motions for summary judgment with respect to certain counts of the plaintiff's declaration were allowed by *Greaney, J.*, and the remaining counts were tried before *Porada, J.*, a District Court judge sitting under statutory authority.

*Louis Kerlinsky* for the plaintiffs.

*Samuel A. Marsella* for the defendant.

SMITH, J. The plaintiffs, lessees of a commercial building, brought this action in twenty counts, alleging deceit, misrepresentation, negligence, and breach of contract against the lessor, National Management Corporation (National). The matter was referred to a master, who found for National on all counts. Subsequently, a Superior Court judge granted summary judgment in favor of National on eighteen of the twenty counts contained in the plaintiffs' complaint. A jury trial on the remaining two counts, both alleging breach of contract, was halted by the trial judge when she allowed the defendant's motion for a directed verdict after the close of the plaintiffs' evidence. By this appeal, the plaintiffs contend that the granting of the summary judgment motion and the allowance of the motion for a directed verdict were error.[2]

We summarize the relevant evidence in regard to the plaintiffs' contentions.[3] In September, 1965, Buker, who was interested in purchasing a restaurant, entered into negotiations with one Lemire, the major stockholder of a corporation then operating a restaurant on premises leased from National. Buker inspected the building, and Lemire assured him that at that time the premises were in good con-

---

[2] In their brief the plaintiffs submitted eleven issues for our consideration. Some of these issues are discussed and disposed of in the opinion, wherein we rule against the plaintiffs on their two central contentions. Because of our decision we do not discuss certain other issues, for example, the "elements of damages receivable in this case."

[3] The evidence is taken from the master's report, which was read to the jury at trial and which the motion judge considered, among other things, in deciding the summary judgment motion.

dition, causing Lemire no difficulties in the operation of his business. Subsequently, Lemire agreed to sell, and Buker to purchase, the assets of the restaurant business. In partial consideration for the purchase price, Lemire agreed to help Buker obtain a new long-term lease from National for the premises.

Buker had three meetings with Harry Young, then chief executive of National. Two of the meetings, at which Lemire was present, were prior to the closing, and the third was at the closing when the lease was signed. During one of those meetings, Lemire stated that he had repaired the roof so that it no longer leaked and that he had no trouble with the boilers. During the course of the meetings, Young adopted Lemire's statements about the heating system and roof and commented that the driveway was new. Young further stated that the building on the premises was old but had been repaired recently and was in operable condition so far as he knew. Young also remarked that although National's lessees were obliged to make "minor repairs" Buker "had nothing to worry about." A written lease, for an eight-year term, was executed in November, 1965, by Young, in behalf of National, and by Buker, in behalf of Bee and Jay, Inc. (B & J), a corporation established by Buker to operate the restaurant. Under the lease B & J, as lessee, acknowledged that the premises were then in good repair and also undertook responsibility for keeping the premises in that condition during the term of the lease.

Almost from the outset of his occupancy in December, 1965, Buker experienced difficulties with the premises. During the winter of 1965-1966, the boilers performed erratically, occasionally providing insufficient heat and hot water; certain areas of the roof leaked; and the sewage system frequently backed up and became inoperable. There were also several lesser problems, both structural and sanitary, that plagued the restaurant building.

In January, 1966, Buker spoke with Young and enumerated his complaints concerning the condition of the building. Young expressed surprise but acknowledged he had

not been inside the restaurant for "some time." The conversation concluded with Young's promise to come to the restaurant to see the conditions for himself and his expression of the expectation that Buker and he would "work things out." Young died shortly thereafter, and no inspection was ever undertaken by National or its representatives.

Although Buker undertook some repairs of the building and its fixtures, the heating and sanitary systems continued to malfunction sporadically during the following year, and those conditions contributed to Buker's decision to close the restaurant in March, 1967. B & J had stopped paying rent on the building in February of that year, but apparently the event which precipitated Buker's decision to close the restaurant was the cancellation of insurance on the boiler system because of the inadequacy of its safety devices. Some months later, in July, 1967, Buker and B & J filed petitions in bankruptcy. Both were adjudicated bankrupt as of the respective filing dates. The schedules of assets in both petitions included claims against National similar to those advanced by both plaintiffs in this case. These claims were not pressed by the trustee in bankruptcy, the same individual having been appointed in both cases. He was discharged in Buker's case by order dated June 4, 1970, and in B & J's case on September 30, 1970.

1. *Summary judgment decision.* We consider first the plaintiffs' contention that a Superior Court judge erred in granting summary judgment on eighteen of the twenty counts contained in the plaintiffs' complaint.

a. *Statute of limitations.* The master found that by January 22, 1966, Buker knew or should have known of the defective conditions that formed the basis of the plaintiffs' allegations that National had engaged in deceit and misrepresentation, or had been negligent, in negotiating the lease of the restaurant building. The writ commencing this action was dated January 5, 1971, almost five years later. On the basis of these findings, the judge ruled that eleven counts of the plaintiffs' complaint which sounded in tort were barred by the two-year statute of limitations then gov-

erning such actions[4] and granted summary judgment in favor of National on those counts.   The plaintiffs contend that the ruling was in error, and the actions timely filed, because the statute of limitations was tolled during the three-year period when their assets were under the control of a trustee in bankruptcy.[5]   The plaintiffs do not cite any case or statute which holds that the statute of limitations is tolled during the period that the assets of a bankrupt are under the control of a trustee in bankruptcy.[6]

The purpose of the bankruptcy statutes is broadly defined as the "seizure of an insolvent debtor's assets in the interest of an impartial application of them to his creditor's [*sic*] demands, . . . [and] as a means of relieving his distress and rehabilitating him financially while rendering [to] his creditors all for which they may reasonably hope." *Harris* v. *Zion's Sav. Bank & Trust Co.*, 317 U.S. 447, 451 (1943). See *Perez* v. *Campbell*, 402 U.S. 637, 648 (1971).   To that end, preexisting claims of the sort here asserted become assets of the estate in bankruptcy and may be prosecuted by the trustee in bankruptcy for the benefit of the estate and the bankrupt's creditors.   11 U.S.C. § 110(a)(6) (1976).   *Tamm* v. *Ford Motor Co.*, 80 F.2d 723, 726-727 (8th Cir. 1936). See note 6, *supra*.[7]   Those provisions are intended to assure

---

[4] General Laws c. 260, § 2A, as in effect prior to St. 1973, c. 777, § 1.

[5] We note in Buker's case that his assets were in trusteeship for somewhat less than three years, and that even were we inclined to accept the plaintiffs' argument regarding tolling during bankruptcy, his claims would nonetheless be time-barred.

[6] The Bankruptcy Act provides that the trustee in bankruptcy may bring suit on behalf of the debtor's estate within two years of the time the debtor was adjudicated bankrupt if, at the time the debtor filed for bankruptcy, the claim was not time barred.   11 U.S.C. § 29(e) (1976).   (In 1978 the Bankruptcy Act was substantially altered.   See now 11 U.S.C. § 108[a] [Supp. V 1981].)   *Kagan* v. *Levenson*, 334 Mass. 100, 102-103 (1956).   The plaintiffs do not suggest that § 29(e), obviously enacted to encourage an orderly marshalling of an estate in bankruptcy, has any relevance to the contention that they advance before this court.

[7] In this case, the master found that the potential claim against National was listed in the schedule of assets of both the plaintiffs.   Thus, we surmise that the plaintiffs were conscious of a possible claim against National, a

that a cause of action not yet time-barred will not be lost while a trustee in bankruptcy assesses the economic potential of the bankrupt estate. Tolling the statute of limitations during the entire period of bankruptcy would provide "bonus time" to the debtor of no apparent benefit to his creditors while permitting the debtor, after discharge from bankruptcy, to resurrect a stale claim. We do not read such an unlikely purpose into the Bankruptcy Act.

Thus, the judge was correct in holding that the statute of limitations barred the counts sounding in tort. We are not inclined to tamper with limitation periods enacted by the Legislature to "promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Burnett* v. *New York Cent. R.R.*, 380 U.S. 424, 428 (1965), quoting *Order of R.R. Telegraphers* v. *Railway Exp. Agency, Inc.*, 321 U.S. 342, 348-349 (1944). See *Olsen* v. *Bell Tel. Labs., Inc.*, 388 Mass. 171, 174-175 (1983).

b. *Warranty of suitability.* The Superior Court judge also granted summary judgment in favor of National on seven counts alleging breach of a warranty that the leased premises would be suitable for the plaintiffs' commercial purposes. The judge's ruling was based on the principle that no such warranty may be implied in the rental of commercial property. *Gade* v. *National Creamery Co.*, 324 Mass. 515, 518-519 (1949). Compare *Boston Housing Authy.* v. *Hemingway*, 363 Mass. 184, 199 (1973). See *Young* v. *Garwacki*, 380 Mass. 162, 171 n.12 (1980). The plaintiffs argue that the ruling was in error because there were certain express warranties of suitability given them by National.

---

claim that could have been asserted at any time during the period of one and one-half years preceding their declarations of bankruptcy. Similarly, the trustee of their estates was on notice of the potential claims and had an additional two years from adjudication to bring such an action had he concluded that to do so would have proved of benefit to the estate in bankruptcy.

The plaintiffs' argument is flawed in several respects. Though we do not doubt that a lessor may, by contract, expressly warrant the suitability of a commercial property, the written lease in the instant case made no such warranty. In fact, the lease specifically provided that B & J, as lessee, acknowledged that the premises were in good order at the outset of its occupancy, and covenanted to prevent damage to the property and to return it in good order to National at the end of the term of the lease. By the provisions of the lease, the lessee accepted the leased premises as they were and undertook full responsibility for maintaining them in good repair. Even had the defendant given oral warranties prior to execution of the lease, those warranties would have been superseded by the unambiguous provisions of the integrated written agreement and, therefore, unenforceable as matter of law. *Kidder* v. *Greenman*, 283 Mass. 601, 609 (1933). *Robert Indus., Inc.* v. *Spence*, 362 Mass. 751, 753-754 (1973). *Poskus* v. *Braemoor Nursing Home, Inc.*, 6 Mass. App. Ct. 896, 897 (1978). Nor may the subsequent oral promise by National's representative to "work things out" with Buker be construed as some form of warranty or as a valid modification of the written lease, for the statement was too vague to constitute the basis of a modified contract, *Held* v. *Zamparelli*, 13 Mass. App. Ct. 957, 958 (1982), and cases cited therein, and was unsupported by consideration. *Veneto* v. *McCloskey & Co.*, 333 Mass. 95, 101 (1955). *Tri-City Concrete Co.* v. *A.L.A. Constr. Co.*, 343 Mass. 425, 427 (1962).[8]

There being no express warranty, the judge properly granted summary judgment on the warranty counts in the plaintiffs' complaint, applying the settled rule that no war-

---

[8] We reject the plaintiffs' contention that their reliance on the promise constituted adequate consideration, for there is no credible evidence of such reliance, nor would such reliance have been reasonable in this context since the promise was inherently vague. See part 2(b), *infra*. Moreover, the plaintiffs had a preexisting duty to maintain the premises in good repair, so they surrendered nothing of value in continuing their practice of maintaining the premises in the aftermath of the defendant's statement.

ranty of suitability will be implied in commercial lease transactions. *Gade* v. *National Creamery Co., supra* at 518-519. See *Young* v. *Garwacki, supra* at 171 n.12.

2. *Directed verdict decision.* Two counts of the plaintiffs' complaint remained after the judge granted partial summary judgment for National. These remaining counts, alleging breach of contract, were brought to trial before a jury on the basis of the master's report and other evidence. The plaintiffs apparently tried the case on the theory that National was in breach of an express warranty that the premises were in good condition, was in breach of its alleged agreement to repair the premises, and was in breach of an implied covenant of quiet enjoyment. After the plaintiffs rested, the judge allowed National's motion for a directed verdict. The plaintiffs claim error on several grounds. We discuss their contentions seriatim.

a. *Express warranties.* The plaintiffs' central contention is that there was sufficient evidence before the jury to permit them to find that the defendant was liable on certain express warranties with respect to the condition of the leased premises. As we have already noted, there is no basis in the law of this Commonwealth for an implied warranty of suitability with respect to the leasing of commercial premises. See part 1(b), *supra.* Our review of the plaintiffs' evidence discloses no evidence of any statements made by National's representative, after execution of the lease, that may reasonably be construed as constituting an express warranty amending the terms of the written lease. See part 1 (b), *supra.* The plaintiffs' several contentions to the contrary are without merit.

b. *Agreement to repair.* At trial, Buker testified that National's representative, after hearing of the plaintiffs' difficulties for the first time during the telephone conversation of January, 1966, had told Buker "that he could come over and that he would fix the problems to [Buker's] satisfaction." The plaintiffs contend that National is estopped to deny that the lease was amended by that promise. They suggest that in reliance on that statement they continued to make repairs to the building.

Nothing in the record, however, suggests that the promise was made with the intention of inducing Buker's reliance on its substance or that Buker altered his conduct in reliance on the statement. See *Tull* v. *Mister Donut Dev. Corp.*, 7 Mass. App. Ct. 626, 631-632 (1979). See also *Cellucci* v. *Sun Oil Co.*, 2 Mass. App. Ct. 722, 728 (1974). Indeed, the plaintiffs' preexisting contractual duty to keep the premises in good repair — a duty they had commenced to undertake well prior to the conversation here at issue — undermines their contention that repairs were made in reliance on the defendant's general promise. Even were such reliance shown, it would have been unreasonable to rely on the defendant's promise, which was inherently vague. See *Tull* v. *Mister Donut Dev. Corp.*, *supra* at 632 (requirement that reliance be reasonable).[9]

c. *Covenant of quiet enjoyment.* Last, the plaintiffs argue that the condition of the leased premises had so degenerated by March 21, 1967, when the insurance coverage on the building's heating plant was revoked and the restaurant permanently closed, that the defendant's failure to repair the premises constituted constructive eviction and was, therefore, a breach of the covenant of quiet enjoyment. Such an argument overlooks the central fact that the plaintiffs, rather than National, assumed responsibility for maintaining the premises in good repair.

The master specifically found that the boilers were operative when the plaintiffs first occupied the building and that

---

[9] The plaintiffs bore the burden of proving that the original written contract had been modified by a subsequent agreement. As we have noted, there was no evidence to suggest that either party altered its conduct after the January, 1966, telephone conversation — indeed it is clear that thereafter the plaintiffs continued, until March, 1967, their existing practice of making repairs, and that National never undertook any repairs to the premises. Standing alone, in direct contradiction to the written contract and unsupported by any evidence of modification that could be inferred from the conduct of the parties, Buker's testimony was not sufficient to create a jury question on the issue of an oral modification of the terms of the lease. *Taran Distrib., Inc.* v. *Ami, Inc.*, 237 F.2d 488 (7th Cir. 1956).

there was no evidence that the boilers had ceased to operate by March, 1967. Rather, he found that the cancellation of the boiler insurance was motivated by safety considerations and that the system would have been rendered insurable had a defective safety value been replaced. We consider the replacement of that valve to be a "repair" within the meaning of that term as used in the lease agreement. Hence, it was the plaintiffs' duty to replace the valve, and a reasonable jury could not have concluded otherwise. While failure to make repairs which leaves the premises in an uninhabitable condition may constitute a breach of the covenant, the plaintiffs by the terms of the lease were obligated to make repairs. Because the plaintiffs had the obligation to make repairs, no act or failure to act of the defendant caused them to yield the premises. See *Stone* v. *Sullivan*, 300 Mass. 450, 455 (1938).

Having rejected each of the plaintiffs' various contentions, we conclude that the several rulings which form the basis of this appeal were properly made.

*Judgment affirmed.*