Houston, J.
Anthony and Janice Donofrio have brought this action against their former landlords, William and Irene Panagiotes, claiming damages from constructive eviction, breach of implied warranty of habitability, breach of the covenant of quiet enjoyment, private nuisance, intentional infliction of emotional distress, deceit and misrepresentation, interference with contractual relations, and violation of the Massachusetts consumer protection law. The defendants counterclaimed for breach of contract, conversion, unjust enrichment, negligence, and deceit. Irene Panagiotes was granted a directed verdict at the close of the plaintiffs evidence at a trial without jury. Based upon all the credible evidence submitted at trial, the court makes the following findings of fact and rulings of law.
FINDINGS OF FACT
Anthony and Janice Donofrio were co-owners of Shear Expressions, a beauty salon. Shear Expressions became a tenant at a mall owned by the defendant, William Panagiotes, in 1986. When their original lease was up in 1987, the Donofrios negotiated with Mr. Panagiotes a new five-year lease with a five-year option to renew. Relying on this lease, the Donofrios remodelled Shear Expressions in 1989. Around the time of the negotiations, Mr. Panagiotes told the Donofrios that he was planning on finding an anchor store for the mall; by the time the Donofrios left, there still was no such store.
Relations between the two parties were amicable until 1990. At that time, maintenance of the mall property began to deteriorate. Several times the parking lot was not plowed in a timely manner, making the lot icy and slippery. When notified of this problem by his tenants, Mr. Panagiotes said, “God put [the snow and ice] there. Let God take it away.” One customer of Shear Expressions refused to go there at night any more because of these problems. Another customer had to be towed out of the parking lot.
Other problems plagued the mall as well. Sewage overflowed into the parking lot on more than one occasion. The parking lot lights were not lit at night. Several shops in the mall were vacant, and some were boarded up, making the entire mall look deserted. Ms. Donofrio notified Mr. Panagiotes of these problems orally and in writing. At one point the Board of Health cited him for the sewage problem. Based on these and other issues, the parties negotiated a rent reduction in May 1991.
To the Donofrios, the most distressing problem at the mall was that the water used by Shear Expressions was cut off several times. The first shut-off occurred on September 7, 1991. A few days earlier Ms. Donofrio had called Mr. Panagiotes to complain that the dumpster was full. Mr. Panagiotes had replied that they “should just get out,” and that he would shut the water off. On September 7, Mr. Panagiotes told another tenant of the building that he had shut the water off because he was having problems with the hairdressers.
On December 3, 1991, Ms. Donofrio called Mr. Panagiotes to complain about the iced-over parking lot. He replied that Shear Expressions could “get the hell out,” and threatened to shut off the water and the electricity. On December 4 the water was shut off. The next day, Mr. Panagiotes sent a plumber to winterize the building by shutting the water off permanently. Mr. Panagiotes told the plumber to leave water going to a dance studio which was the only other remaining *150 tenant in the building. When the plumber realized that Shear Expressions was also a tenant in the building, he contacted Mr. Panagiotes, who agreed to leave the water running to Shear Expressions as well. The salon lost water for a few hours that day while the plumber did his work.
Shear Expressions could not conduct business without water. When the water went off during the work-day, employees of Shear Expressions had to buy bottled water to rinse chemicals out of customers’ hair before their scalps burned, and the shop had to cancel all other appointments for the day.
Mr. Panagiotes’s attorney sent a letter dated January 8, 1992 to the Donofrios’ attorney. The letter stated, “Please be advised that my client will be closing the property being occupied by the above named tenant at sufferance [Shear Expressions]. My client no longer has the financial ability to sustain the premises. In addition, your clients have been in breach of their lease for several months.”
On January 11, 1992, the water was once again shut off. At that point the Donofrios concluded that it was no longer feasible to run their business out of this property. They searched for and found another location, spent considerable money converting into a suitable space, and reopened for business on February 15, 1992.
RULINGS OF LAW
The plaintiffs may recover damages arising from Mr. Panagiotes’s breach of the covenant of quiet enjoyment, interference with contractual relations, and violations of G.L.c. 93A. Verdict is for the defendant on all other counts brought by the plaintiffs. Verdict is for the plaintiffs on all the defendant’s counterclaims.
In Counts I and III of their complaint, the plaintiffs alleged that Mr. Panagiotes constructively evicted them and breached the covenant of quiet enjoyment. A landlord’s serious and unexcused failure to furnish essential services to a commercial tenant deprives the tenant of a vital part of what the landlord knows the tenant must have in order to carry on business. Charles E. Burt, Inc. v. Seven Grand Corporation, 340 Mass. 124, 163 N.E.2d 4, 6 (1959). Essential services include light, heat, power, and elevator service. Id. Failure to provide such services constitutes a breach of the covenant of quiet enjoyment and enables the tenant to recover the damages caused to him thereby. Id. This failure also provides the defense of constructive eviction. Id.
Mr. Panagiotes willfully cut off his tenants’ water supply, knowing that this would make them unable to carry on their business. He thereby breached their covenant of quiet enjoyment. The plaintiffs are entitled to recover damages sustained from this breach.
In Count II, the Donofrios claimed that Mr. Panagiotes breached an implied warranty of habitability. Although express warranties may be made to commercial tenants, there is no implied warranty of suitability or habitability in commercial leases. Buker v. National Management Corporation, 16 Mass.App.Ct. 36, 42 (1983), rev. den. 389 Mass. 1104 (1983). The plaintiffs’ allegation fails as a matter of law on this count.
The Donofrios further alleged, in Count IV of their complaint, that Mr. Panagiotes’s acts and omissions at the mall created a private nuisance. A private nuisance is actionable when a property owner creates, permits, or maintains a condition on its property that causes a substantial and unreasonable interference with the use and enjoyment of the property of another. Tarzia v. Hingham, 35 Mass.App.Ct. 506, 510 (1993). A tenant cannot sustain a suit against his or her own landlord for a nuisance on the property that the tenant rents from the landlord. Doe v. New Bedford Housing Authority, 417 Mass. 273, 289 (1994). Thus, a tenant cannot claim nuisance against a housing authority plagued by drug activity. Id. Because a claim of private nuisance cannot be sustained against the plaintiffs’ landlord, the court finds for the defendant as a matter of law on this count.
In CountV, the plaintiffs pleaded intentional infliction of emotional distress. To prevail on such an action, they must show that the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of this conduct; that the conduct was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community; that the actions of the defendant caused the plaintiffs distress; and that the emotional distress sustained by the plaintiff was severe and of a nature that no reasonable man could be expected to endure it. Agís v. Howard JohnsonCo., 371 Mass. 140, 145 (1976). The plaintiffs did not submit any evidence that they suffered emotional distress from the conduct of the plaintiff, let alone distress that was severe and unendurable. Directed verdict is therefore granted to the defendant on this count.
In Count VI, the Donofrios alleged deceit and misrepresentation. They claimed that Mr. Panagiotes represented to them that an anchor store would move into the mall; that he made this representation to induce them to renew their tenancy; that this representation was false; that they justifiably relied on his representations; and that their business was harmed by this misrepresentation. The plaintiffs did not sustain their burden of showing either that Mr. Panagiotes made this statement in order to induce the plaintiffs to renew their tenancy, or that he knew his representation was false at the time that he made it. Verdict is for the defendant on this claim.
In Count VII, the plaintiffs alleged that Mr. Donofrio interfered with their contractual relations. To prevail on a claim of interference with contractual relations, *151 the plaintiffs must prove that a business relationship or contemplated contract of economic benefit existed; that the defendant had knowledge of such relationship; that the defendant intentionally and maliciously interfered with the relationship; and that the plaintiffs loss of advantage directly resulted from the defendant’s conduct. Comey v. Hiü, 387 Mass. 11,438 N.E.2d 811, 816 (1982).
The Donofrios have sustained their burden of proving that Mr. Panagiotes interfered with their contractual relations with customers who could not be served on the days the Shear Expressions had no water. An actual or contemplated contract of economic benefit existed with these customers. Mr. Panagiotes knew that Shear Expressions had customers on these days. He intentionally turned the water off in order to interfere with the work at Shear Expressions. The Donofrios lost the income that would have been generated from these appointments as a direct result of Mr. Panagiotes’s actions. The Donofrios must be compensated for this lost business. The Donofrios did not demonstrate, however, that they lost any walk-in business, or that any customers discontinued their patronage of the salon as a result of the lack of water. Hence, the court finds that the plaintiffs may recover on this count only for lost profits from cancelled appointments on the days the salon had no water.
Finally, in Count VIII, the Donofrios alleged a violation of G.L.c. 93A, §11. Under this statute, any person who engages in the conduct of any trade or commerce, and who suffers any loss of money as a result of the use or employment by another person who engages in any trade or commerce of an unfair or deceptive act or practice, may recover for that loss. To prevail, the plaintiffs must demonstrate that the objectionable conduct attained a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of business. Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498 (1979). The plaintiffs may recover double or triple damages if the unfair act or practice was a willful or knowing violation. G.L.c. 93A, §11.
Mr. Panagiotes’s conduct was an unfair act under G.L.c. 93A. He responded to complaints about conditions at his property by carrying out threats to turn the water off, knowing that a beauty salon, even more than other businesses, cannot function without water. He did this willfully and knowingly. Double damages are appropriate.
DEFENDANT’S COUNTERCLAIMS
Based on the above finding that the defendant’s actions amounted to a constructive eviction of the plaintiffs, the plaintiffs did not breach their lease in leaving the premises. Although for several months prior to vacating the tenants paid less than the rent stated in the lease, this was as a result of a rent reduction negotiated by the parties. The plaintiffs therefore prevail on the defendant’s counterclaims of breach of contract, conversion, and unjust enrichment. The defendant put forth no evidence on his claims of negligence and deceit, and the plaintiffs prevail on these claims as well.
DAMAGES
The plaintiffs’ verified damages, including lost business on the days there was no water, the cost of relocating to the new shop, and lost profits while they relocated, amount to $31,558.73. Because the defendant’s conduct was willful and knowing, the damages are doubled to $63,117.46. In addition, attorneys fees in the amount of $11,102.90 are awarded.
ORDER
It is therefore ORDERED that judgment enter for the plaintiffs in the amount of $74,220.36, plus interest and costs as provided by law, against the defendant William Panagiotes.