MICHAEL T. MCCARTIN & another[1] vs. RICHARD L.
WESTLAKE & others[2] (and a companion case[3]).

No. 92-P-760.

Middlesex. November 9, 1993. - March 14, 1994.

Present: JACOBS, GILLERMAN, & PORADA, JJ.

*Fraud. Contract*, Franchise agreement. *Evidence*, Extrinsic affecting writ-
ing, Relevancy and materiality, Intent. *Consumer Protection Act*,
Availability of remedy. *Damages*, Breach of contract.

The deliberate, uncoerced, and businesslike process by which the parties to
a franchise agreement reached final, written agreements permitting the
sale and rental of medical equipment and supplies under a certain
trademark did not support a claim in a civil action brought by the fran-
chisees that they understood that the commitment and obligations of
the parties were otherwise than as stated in the signed contract docu-
ments, and the judge should have allowed the franchisors' motion for
directed verdicts on claims alleging deceit, thus vacating the jury's ver-
dict that the franchisors fraudulently induced the plaintiffs to enter the
written agreements, i.e., franchise, guaranty, and noncompetition agree-
ments. [230-233]
In the circumstances of a franchise agreement in which the plaintiff fran-
chisees, who understood and agreed to be bound only by the written
agreement they negotiated with the defendant franchisors, could not
reasonably rely upon any contrary or different statements made to them
during negotiations, a judgment should not have been entered in favor
of the plaintiffs on G. L. c. 93A claims. [233-234]
Claims of both parties to a franchise agreement, alleging breach of con-
tract, were to be retried where, having decided that the plaintiffs were
fraudulently induced to enter the agreement as well as related guaranty
and noncompetition agreements, the jury should not have proceeded to
assess damages for breach of the agreement they found unforceable by
reason of fraud; in addition, the jury's deliberations about the contract
claims may have been improperly affected by their decision on the
fraud claims. [234-235]

---

[1]Joel F. Hedlund.
[2]Edward Almon and Claflin Home Health Centers, Inc.
[3]Claflin Home Health Centers, Inc. vs. Michael T. McCartin, Joel F.
Hedlund, and Massachusetts Medical Sales, Inc.

McCartin v. Westlake.

CIVIL ACTIONS commenced in the Superior Court Department on December 30, 1988, and April 5, 1989, respectively.

The cases were tried before *Katherine Liacos Izzo*, J.

*John A. Houlihan* for Richard L. Westlake & others.

*William H. Carroll* for Michael T. McCartin & others.

GILLERMAN, J. At least since *Bates* v. *Southgate*, 308 Mass. 170 (1941),[4] we have witnessed the need, in cases challenging the enforceability of a contract on the claim of fraud, to resolve the conflict between providing relief to victims of the alleged fraud and fending off the threat to contractual certainty (by denying such relief). Compare *Plumer* v. *Luce*, 310 Mass. 789 (1942) (denying relief), with *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. 704 (1990) (granting relief). See most recently *Greenery Rehabilitation Group, Inc.* v. *Antaramian, ante* 73 (1994) (denying relief). This case is to be added to those that have denied relief.

After describing the prior proceedings, we set out, in some detail, the contract documents and the pertinent testimony, followed by a statement of the reasons for our decision.

1. *Prior proceedings.* We are concerned with two consolidated actions, both having to do with the grant of a franchise permitting the sale and rental of durable medical equipment and medical supplies under the trademark "Claflin Home Health Center." One was brought by Michael T. McCartin and Joel F. Hedlund, owners of the franchisee, Massachusetts Medical Sales, Inc. (MMS), against Richard L. Westlake, Edward Almon, and Claflin Home Health Centers, Inc. (CHHC), the franchisor (Westlake and Almon were officers of CHHC). The second action was brought about three months later by CHHC against McCartin, Hedlund, and MMS for defaults in the various franchise agreements described below. In this second action a counterclaim was filed that sets up essentially the same claims described in the complaint in the first action. For convenience we refer to MMS and the plaintiffs in the first action, McCartin and Hedlund

[4]*Bates* v. *Southgate* removed the distinction between fraud that is antecedent to a contract and fraud that enters into the making of a contract.

(who are the plaintiffs in counterclaim in the second action), as the plaintiffs; and we refer to the defendants in the first action, CHHC, Westlake, and Almon (who are the defendants in counterclaim in the second action), as the defendants.

The plaintiffs' claims (as set out in their counterclaim in the second action) are for deceit (Count I), breach of contract (Count II), and violation of G. L. c. 93A (Count III).[5] The defendants' claims in the second action are for breach of franchise agreement (Count I), payment for goods sold and delivered (Count II), breach of guaranty and noncompetition agreement signed by McCartin (Count III), breach of guaranty and noncompetition agreement signed by Hedlund (Count IV), conversion of property of CHHC by the plaintiffs (Count V), violation of G. L. c. 93A (Count VI), and injunctive relief (Count VII).

The contract and fraud claims were tried to a jury. In response to special questions, the jury found that the defendants fraudulently induced MMS to enter into the franchise agreement, in consequence of which the plaintiffs suffered damages in the amount of $108,711 (Count I), that CHHC failed to perform its contractual obligations under the franchise agreement, in consequence of which the plaintiffs suffered damages in the amount of $30,000 (Count II), that the defendants fraudulently induced McCartin and Hedlund to enter into the guaranty and noncompetition agreements, and (in an advisory verdict to the judge in connection with the c. 93A claim) that the defendants committed unfair and deceptive acts or practices. Regarding the c. 93A claim (Count III), the judge doubled the jury's award for deceit and awarded the plaintiffs $217,422.[6] Interest and costs were added to all awards, plus attorneys' fees on the c. 93A claim.

The case comes up from the judge's denial of the defendants' motion for directed verdicts and from the denial of

---

[5]In the first action the plaintiffs' claims did not include breach of contract.

[6]The possibility that the judge's doubling of the jury's award for damages was duplicative of the jury's award, see *Calimlim* v. *Foreign Car Center, Inc.*, 392 Mass. 228, 235-236 (1984), is rendered moot by the result we reach.

their motion for judgments notwithstanding the verdict.[7] The standard of review for both rulings is the same: whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff." *Dobos* v. *Driscoll*, 404 Mass. 634, 656, cert. denied sub nom. *Kehoe* v. *Dobos*, 493 U.S. 850 (1989).

2. *The evidence.* We summarize the evidence most favorable to the plaintiffs, and we set out the substance of the undisputed contract documents.

Both McCartin and Hedlund were experienced in the sale of medical equipment, but neither had operated a retail store. CHHC was organized in March, 1982, to engage in the business of franchising retail stores that sold and leased home health care equipment and supplies. Hedlund knew the defendants from his sales activities, and he knew that a franchise was available. McCartin and Hedlund decided to investigate the business opportunity.

The pace of the transaction was unhurried. Negotiations with the defendants for the purchase of an existing CHHC franchise store in Newton began at a meeting among the four individual parties in December, 1985. Subsequent meetings took place in January, 1986, and in March, 1986, and there were telephone conversations as well.

In January, 1986, McCartin and Hedlund, who were represented by counsel, received CHHC's fifty-page franchise offering circular, a comprehensive disclosure statement mandated by Federal law, see 16 C.F.R. § 436 (1993), and more fully described below. Attached to the disclosure statement were CHHC's financial statement and a proposed franchise agreement. It was not until April 18, 1986, that the closing documents, including the agreement covering the purchase of the rental inventory, resale inventory, fixtures, and goodwill, as well as the franchise agreement and the related personal

---

[7]The defendants also appeal from the denial of their motion for a new trial. That appeal arises in connection with the judgment entered in favor of the plaintiffs on the defendants' c. 93A claim, discussed *infra*.

guaranties and noncompetition agreements, were signed in the office of counsel to the plaintiffs.

The plaintiffs, who filed their action on December 30, 1988, allege, in substance, that during the course of the negotiations[8] the defendants made the following representations.[9]

> (i) Almon and Westlake led the plaintiffs to believe that personnel of The Claflin Company, an affiliate of CHHC and "Rhode Island's largest medical equipment supply company, would provide assistance and support" to the plaintiffs.

> (ii) Almon and Westlake "stated they were going to expand the CHHC franchise system to a major national franchise network consisting of two hundred stores that would have regional and national name recognition by 1989."

> (iii) The defendants "would also secure the necessary venture capital to accomplish this expansion," and the defendants stated "that a regional and nationwide advertising campaign would be implemented."

> (iv) "Support teams would be available to help in operations, marketing and sales."

---

[8]Illustrative of the negotiations was the meeting in March, 1986, when the parties met and discussed the transaction. The focus of the discussion was the support and advertising the plaintiffs could expect from the franchisor. McCartin, testifying, put it this way: "We went around with them several times through several conversations on what was due us as the franchisee from the franchisor, and we had a whole list of things. We looked at the franchise document, and it was very explicit and clear what went from us to them. All it said about what went from them to us was support and advertising, basically, and we had serious questions on, well, what is the support and advertising? . . . [T]hey'd think of something else and say, 'We also do this,' and we'd say, 'What about that?'. . . [We had a] list of about a dozen things."

[9]The testimony of the plaintiffs regarding the misrepresentations is diffuse, and we rely on the plaintiffs' brief for the description of the alleged misrepresentations. The quotations in the subparagraphs are from the plaintiffs' brief.

(v) The plaintiffs "would have access to volume buying power through their association with The Claflin Company."

Summing up these representations, McCartin testified, "First and foremost, at least most dramatic, is we were going to be on the ground floor of a growing national concern that was going, in a very few years, to be two hundred stores nationwide. That was going to be accomplished through venture finance — venture capital financing, and, you know, other arrangements that Joel and I just weren't familiar with. But this had been described to us."

As to the falsity of these representations, the plaintiffs claim[10] that the "representations as to advertising by the [defendants] never came to be"; that the "volume buying power that was available through The Claflin Company did not exist"; that there "were no support teams available to help [the plaintiffs] in operations, marketing and sales"; and, "*[m]ost important*, [the defendants] knew that the venture capital needed to implement the expansion, growth, and resulting name recognition, had not been obtained when the Franchise Agreement was signed" (emphasis added). Summarizing the claim, McCartin testified, "The stores, the venture capital . . . the volume purchasing . . . the support teams . . . the advertising. None of it ever came to pass." Hedlund characterized the discussions regarding The Claflin Company support network, the plans for "sixty or a hundred" franchise stores, and the "chance to jump on now," as "a general sales pitch."

These alleged misrepresentations, made during negotiations, must be viewed against both the disclosure statement that was received by the plaintiffs in January, 1986, and against the franchise agreement that was signed in April, 1986.

a. *The disclosure statement.* The cover sheet of the disclosure statement describes the document as a

---

[10]The quotations in this paragraph are also from the plaintiffs' brief.

"BASIC DISCLOSURE DOCUMENT
Required By The
FEDERAL TRADE COMMISSION
For
CLAFLIN HOME HEALTH CENTERS, INC.
INFORMATION FOR PROSPECTIVE
FRANCHISEES."

The text below this caption states, in part, "If you find anything you think may be wrong or anything important that's been left out, you should let us [the Federal Trade Commission] know about it. It may be against the law."

The first page of the disclosure statement states, in part, in capital letters, bold type: "THIS OFFERING CIRCULAR AND ALL CONTRACTS OR AGREEMENTS SHOULD BE READ CAREFULLY IN THEIR ENTIRETY FOR AN UNDERSTANDING OF ALL RIGHTS AND OBLIGATIONS OF BOTH THE FRANCHISOR AND THE FRANCHISEE."

Of the twenty-two topics covered in the disclosure statement, the following statements are noteworthy.

The Claflin Company, described as an affiliate of CHHC, owns the name "Claflin" and has licensed CHHC to use and license others to use the mark. If the plaintiffs "purchase[ ] inventory, whether for resale or rental purposes, from the Claflin Company, then the Claflin Company will receive consideration of from zero percent (0%) to twenty-five percent (25%) of the price of such inventory."

During the operation of the franchise, CHHC would be obligated to:

(i) provide operational supervision during the franchisee's opening period;

(ii) make periodic visits "to review all facets of the franchisee's operations, offering advice as to remedies for operating problems of the franchisee's store";

(iii) provide advice and guidance as to additional products;

(iv) offer periodic seminars and meetings to provide the franchisee with additional training;

(v) provide mandatory orientation and training of the franchisee's key personnel in the development, operation, and administration of the CHHC store; the initial training course would last about four weeks and would take place before the opening of the store; "While the franchisor maintains no training staff, the franchisor's employees . . . will conduct the training program. Mary K. Sullivan, R.N., General Manager, will conduct most of the training"; "*The franchisor offers no other supervision, assistance or services than those specified in the Franchise Agreement*" (emphasis added).

The disclosure statement makes additional disclaimers and disclosures:

(i) CHHC "makes no actual or projected claims of sales, profits or earnings of Claflin Home Health Center franchises. *This is a development stage company formed in March 1982, with little or no operating history. This may affect its ability to perform its obligations to the franchisee. The franchisor has currently outstanding six franchises*" (emphasis added).

(ii) "The franchisor estimates that *five (5) franchises will be sold or granted during the one (1) year period following the date of the offering circular*" (emphasis added).

(iii) Audited financial statements of CHHC for 1982, 1983, and 1984 are attached to the disclosure statements; the statement for 1984 shows $19,625 in total assets, of which $529 was cash on hand; capital stock outstanding of $5,000, and other stockholders' equity ("retained earnings") of $14,625. For the year ended December 31, 1984, CHHC had a net loss, after taxes, of $10,674.

b. *The franchise agreement.* The franchise agreement — McCartin testified he "read every word" of the agreement and reviewed it with his attorney — reveals numerous handwritten changes to the printed text, and includes the following provisions:

> (i) Advertising — the franchisee is obligated to pay to CHHC, monthly, for regional and national advertising and promotion one percent of the franchisee's gross monthly receipts, and CHHC has sole right to determine how to spend the funds collected.

> (ii) Training — CHHC shall provide a three-week training program on the operation of the store; the franchisee will implement a training program for its employees, and CHHC may offer additional training seminars.

> (iii) Operating Assistance — if additional assistance is requested by the franchisee, CHHC "shall furnish a qualified representative at such time and place as the parties may deem to be reasonably necessary and mutually convenient." The franchisee must pay all expenses of the representative, plus a per diem rate according to the CHHC fee schedule. Following the opening of the store, CHHC will provide periodic visits and advice and guidance as to operating problems.

> (iv) Paragraph 24 includes the following provision: "*No agent or either party has the authority to make representations or other agreements, verbal or written, which modify or vary the terms or conditions of this Agreement*" (emphasis added).

> (v) Paragraph 29 provides in part as follows: "*The success of the business venture contemplated to be undertaken by Franchisee by virtue of this Agreement is speculative and depends to a large extent upon the ability of Franchisee as an independent business person*

*as well as other factors.* CHHC does not make any representation or warranty as to the potential success of the business venture contemplated by this Agreement. . . . Franchisee acknowledges that s/he has read this Franchise Agreement as well as the Disclosure Document, and that s/he has been given the opportunity to clarify provisions that s/he did not understand and to consult with an attorney or other professional advisor. *Franchisee represents that s/he understands and agrees to be bound by the terms, conditions and obligations of this Agreement. Franchisee acknowledges that s/he has entered into this Agreement after making an independent investigation of CHHC's operations and not upon a representation by CHHC as to profits which Franchisee might expect to realize"* (emphasis added).

3. *Discussion.* The representations upon which the plaintiffs rely, and which they say were false, fall into two groups: operational matters (assistance to, support for, and volume buying power of the franchisee) and the business plan or goals of CHHC (200 franchise stores to be achieved with venture capital financing).[11] But, however classified, the

---

[11]In addition to the denial of relief on the ground described in the text, the representations regarding CHHC's business plans for the future are not actionable because the statements are neither statements of fact nor statements of present intent. As to the former, see *Fogarty* v. *Van Loan*, 344 Mass. 530, 532 (1962); as to the latter, see *Barrett Assocs.* v. *Aronson*, 346 Mass. 150, 152 (1963). Because of the daunting task of obtaining the binding commitment of 200 new franchise owners, as well as binding commitments for venture capital financing necessary for a hugely expanded operation of a speculative enterprise currently in the development stage (so the contract documents say), and whose balance sheet reveals a stockholders' equity of merely $19,625, the statements can only be taken as expressions of the hoped-for, but by no means assured, unfolding of complex future events involving the risk-taking participation of persons and organizations not controlled by the defendants. Indeed, Hedlund acknowledged that he understood the statements to be "a general sales pitch." Reasonable reliance upon the statements regarding business goals for the future is precluded in such circumstances. See *Greenery Rehabilitation Group, Inc.* v. *Antaramian, supra* at 75. See also *Deming* v. *Darling*, 148 Mass. 504, 506 (1889) ("T[his] rule of law [denying recovery for seller's statements recommending his wares] is hardly to be regretted,

statements upon which the plaintiffs rely are not actionable. The deliberate, uncoerced, and businesslike process by which the parties reached final, written agreements cannot be undone merely on the claim, later asserted, that the plaintiffs understood that the commitment and obligations of the parties were otherwise than as stated in the signed contract documents. See *Plumer* v. *Luce*, 310 Mass. at 805 ("The agreement . . . [the plaintiff] signed may not read very much like what she says the proposed arrangement was, but . . . [absent a basis for claiming fraud] she cannot rightly contend that one of the terms of a proposed agreement that never came into existence can be used as a basis upon which to bring the case at bar within the case of *Bates* v. *Southgate*, 308 Mass. 170 [1941]"). We refer to the undisputed facts that the agreement was negotiated over a period of more than three months; the plaintiffs were represented by counsel; changes were made in the contract documents proposed by the defendants to reflect the understanding of the parties; and the franchise agreement contains provisions regarding purchases, support services, and advertising. See *Greenery Rehabilitation Group, Inc.* v. *Antaramian, supra* at 76. See also *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass at

---

when it is considered how easily and insensibly words of hope or expectation are converted by an interested memory into statements of quality and value when the expectation has been disappointed"); *Yerid* v. *Mason*, 341 Mass. 527, 530 (1960) (noting the court's decision in *Harris* v. *Delco Prod., Inc.*, 305 Mass. 362, 365-366 [1940], which held that "an expression of strong belief" was not actionable).

Even if CHHC's business plans for the future could, somehow, be shown to have been expressions of present intent, the plaintiffs have only shown, as McCartin testified, that "[n]one of it ever came to pass." An essential element — the intention not to carry out the promise, existing when the promise was made — was not otherwise shown by any evidence, and could not be inferred merely from the nonperformance of the promise. See *Galotti* v. *United States Trust Co.*, 335 Mass. 496, 501 (1957). The plaintiffs have shown nothing more than that, and we find nothing in their brief to the contrary. Finally, the plaintiffs argue that false statements of fact, recklessly made, may be actionable. That may be, but that rule has no bearing on this case, which does not involve statements of fact.

710-711, discussing (and distinguishing) *Turner* v. *Johnson & Johnson,* 809 F.2d 90 (1st Cir. 1986).[12]

We also refer to the fact that the disclosure statement, which the plaintiffs received and signed in January, 1986, warned the plaintiffs of the need to understand the provisions regarding the obligations of the parties, and the contract documents warned the plaintiffs that CHHC was a speculative venture in the development stage, a condition that could affect the ability of CHHC to meet its obligations. In addition, the franchise agreement, of which McCartin read "every word," warned the plaintiffs that no party had the authority to make any representations that modified or varied the terms of the franchise agreement; it recited the fact that the plaintiffs understood and agreed to be bound by all the provisions of the agreement and that the plaintiffs agreed to be bound only after making an independent investigation of the operations of CHHC, and *not* by reason of any representation of CHHC regarding expected profits of the franchisee. See *Plumer* v. *Luce,* 310 Mass. at 794, 805.

The facts recited are not lightly to be cast aside in favor of providing relief to one who claims fraud. Business people understand that much of what is said during the negotiation of a business agreement never becomes part of the final bargain. Only what matters is reduced to writing and signed. And where that writing warns the buyers that what they sign, and no more, is binding, and the buyers acknowledge that to be so and that they understand what they are signing,

---

[12]The *McEvoy* court noted that, in *Turner,* "the alleged fraud took place during negotiations prior to the signing of the contract. Because of this, the *Turner* court was concerned that representations made during the 'give-and-take of negotiations' before any final commitment or agreement is made, might be raised to contradict what is finally and unequivocally agreed upon in the final version of the contract. As the court stated, in such circumstances, 'the language of a contract simply would not matter anymore.' *Id.* at 96." *McEvoy Travel Bureau, Inc.* v. *Norton Co.,* 408 Mass. at 710-711. Further, "where both parties were experienced in business and the contract was fully negotiated and voluntarily signed, plaintiffs may not raise as fraudulent any prior oral assertion inconsistent with a contract provision that specifically addressed the particular point at issue." *Turner* v. *Johnson & Johnson,* 809 F.2d at 97.

a firm case is made, as matter of law,[13] to enforce what was signed and not what was said during negotiations. That is the case here. Contrast *McEvoy Travel Bureau, Inc.* v. *Norton Co.,* 408 Mass. at 711 (the "threat to contractual certainty does not exist where . . . the misrepresentations were not part of the negotiations but were made immediately prior to the signing of the initial contract"). In sum, the judge should have allowed the defendants' motion for a directed verdict on Count I (deceit) of the complaint in the first case, and on Count I (deceit) of the counterclaim in the second case (thus vacating the jury's verdict that the defendants fraudulently induced the plaintiffs to enter into the franchise agreement, the personal guaranties of Hedlund and McCartin, and the noncompetition agreements of both individuals).

The judgment entered in favor of the plaintiffs on the G. L. c. 93A count in both cases must also be reversed. The judge's ultimate finding was that the defendants had committed unfair and deceptive acts and practices and that they had done so wilfully and knowingly. Those findings were based on the subsidiary findings that "certain statements and representations to the plaintiffs . . . were misrepresentations." The judge continued: "These representations related to the available educational support, advertising, training, and assistance MMS could expect to receive as a franchisee and also as to the financial and general ability of CHHC and its affiliate The Claflin Company to provide such support and assistance. Almon and Westlake also made statements as to the imminent future expansion and financial growth of the CHHC franchise system — none of which ever came to pass."

The subsidiary findings by the judge are identical to those events upon which the plaintiffs rely in support of their common law claim of deceit. Because the plaintiffs understood and agreed to be bound only by the written agreement they

---

[13]This is so because, in the circumstances of this case, similar to those in *Turner* v. *Johnson & Johnson,* 809 F.2d at 96-97, there can be no reasonable reliance upon what the plaintiffs claim was told to them. *McEvoy Travel Bureau, Inc.* v. *Norton Co.,* 408 Mass. at 713, so instructs.

negotiated with the defendants, the plaintiffs, as we have said, could not reasonably rely upon any contrary or different statements made to them during negotiations.[14] Just as these circumstances did not constitute deceit, thereby precluding the common law liability of the defendants, these same circumstances — which provide the only basis put forward by the plaintiffs for the c. 93A liability of the defendants — "would unduly extend the reach of . . . [c. 93A] beyond anything suggested by the statutory language or the prior appellate decisions." *Underwood* v. *Risman*, 414 Mass. 96, 101 (1993). See also *Mechanics Natl. Bank* v. *Killeen*, 377 Mass. 100, 109-110 (1979); *Schwanbeck* v. *Federal-Mogul Corp.*, 412 Mass. 703, 710-711 (1992); *Levings* v. *Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979), *S.C.*, 12 Mass. App. Ct. 990 (1981).

As to the defendants' c. 93A claim against the plaintiffs (see note 7, *supra*), the jury rendered the advisory opinion that the *plaintiffs* had engaged in unfair or deceptive acts or practices. The judge rejected this advice and proceeded to find that the plaintiffs did not violate c. 93A. We see no reason to disturb this finding, see *Wyler* v. *Bonnell Motors, Inc.*, 35 Mass. App. Ct. 563, 567 (1993), and the defendants make no serious arguments to the contrary.

There remain the contract claims of both parties. We conclude that the claims must be retried for several reasons. Having decided that the plaintiffs were fraudulently induced to enter into the franchise agreement as well as the related guaranty and noncompetition agreements, the jury should not have proceeded to assess damages for breach of the franchise agreement they found unenforceable by reason of fraud. See *Forman* v. *Hamilburg*, 300 Mass. 138, 142 (1938) ("Upon discovery of the fraud the plaintiff could have repudiated the contract or could affirm it and bring an action

---

[14]The judge also concluded that, while McCartin and Hedlund read the contract documents, and "had legal advice before signing," the "integration and disclaimer clauses" were "ineffective." For the reasons stated in the text, *supra*, and upon the authorities cited, the judge's conclusion was in error.

for damages"). Further, the jury's deliberations about the contract claims may have been affected by their decision on the fraud claims. For example, the damages awarded the plaintiffs on the contract count ($30,000) would appear to have no evidentiary support in the record, while the stipulated amounts that the plaintiffs failed to pay to the defendants for royalty and advertising fees seem to have been ignored entirely. Nevertheless, even though there was no fraud, the defendants may have failed to perform their obligations under the contract, and the plaintiffs seem to have stipulated that they did not perform their obligations. The contractual issues must be sorted out in a new trial of the contract counts of both parties.

The judgments are vacated in both cases. In case no. 88-7969, judgment for the defendants (Westlake, Almon, and CHHC) is to be entered on Count I (deceit) and on Count II (G. L. c. 93A). As to the second case (no. 89-2192), all claims stated in the complaint, other than Count VI (G. L. c. 93A),[15] as well as the counterclaims for breach of contract, are to stand for trial. Judgment for the defendants (Westlake, Almon, and CHHC) is to be entered on Count VI.

*So ordered.*

---

[15]The defendants' claims in the second case are for breach of franchise agreement (Count I), goods sold and delivered (Count II), breach of guaranty and noncompetition agreements signed by McCartin and Hedlund (Counts III and IV), conversion of property of CHHC (Count V), c. 93A (Count VI), and declaratory judgment and injunctive relief (Count VII).