Robert **ARMSTRONG** and Marc **Pottle, Plaintiffs,**

v.

**ROHM AND HAAS COMPANY, INC., Defendant.**

Civil Action No. 03–40246–FDS.

United States District Court, D. Massachusetts.

Oct. 15, 2004.

---

Robert Armstrong, pro se.

Marc Pottle, pro se.

Richard T. Tucker, Weinstein, Bernstein & Burwick, P.C., Dudley, MA, for Plaintiffs.

Timothy P. Van Dyck, Windy L. Rosebush, Edwards & Angell, LLP, Boston, MA, for Defendant.

## MEMORANDUM AND ORDER

SAYLOR, District Judge.

This is a civil action arising from defendant's alleged breach of an oral agreement to provide plaintiffs with "all the work they could handle." Pending before this Court is defendant's motion to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted.

### I. *Background*

The following facts are as alleged in the complaint.[1] Plaintiffs Robert Armstrong and Marc Pottle were employed as ceramic grinders by Morton International, Inc., at its facility in Spencer, Massachusetts. In 1999 Rohm and Haas Company, Inc., acquired Morton and announced that the Spencer facility would be closed in April 2000.[2] Rohm and Haas gave the Morton employees one month to decide whether to transfer to its facility in Woburn, Massa-

chusetts, or accept a severance package and voluntarily terminate their employment. Employees who chose to transfer to the Woburn facility received an incentive payment larger than that offered as part of the severance package.

Armstrong and Pottle wished to remain with the company. Nonetheless, in May 2000, Thomas Payne, the plant manager of the Spencer facility, suggested that the plaintiffs could make substantially more money if they resigned, accepted the severance package, and started their own company to handle Rohm and Haas' outsourced grinding work. That work, at the time, was being sent to a company called Chand Associates. Payne indicated that the company wished to end its dependence on Chand. In particular, Payne represented to Armstrong and Pottle that the company would give their new business "all the [outsourced grinding] work they could handle" and that the company "would like to" give the plaintiffs "all of its outsourced work in ceramic grinding, which had been in the neighborhood of $10,000 per month."

On July 26, 2000, in reliance on Payne's representations, Armstrong and Pottle resigned from Rohm and Haas, accepted the severance package, and entered into separate Agreements and Releases with the company.[3] In return for the promises made to the plaintiffs if they signed the Agreement, the plaintiffs agreed to release Morton, and its "successors, parents [and] subsidiaries,"

---

1. This recitation of facts is, of course, plaintiffs' version of events, as set forth in the complaint. The issue here is the sufficiency of the proposed pleading, not whether the evidence actually supports those allegations.

2. Rohm and Haas is the only defendant in this action. Counsel for defendant indicated at oral argument that Rohm and Haas has succeeded to all of the obligations and liabili-

ties of Morton, if any, related to this action, and that defendant did not contest plaintiffs' failure to name Morton as a party.

3. Because the two contracts are essentially identical, for the sake of convenience the two will be referred to collectively as "the Agreement."

from any and all manner of claims, demands, actions, causes of action, suits, arbitration proceedings, debts, costs, judgments, executions, claims and demands of whatsoever nature, direct or indirect, known or unknown, asserted or unasserted, matured or not matured, which [plaintiffs] ... ever had, now or hereinafter can, shall or may have against the [company], from the beginning of time until the present, arising out of or in any manner relating to all events or circumstances in any way related to [plaintiffs'] employment with [the company] or the separation of that employment.

Agreement ¶ 12. The plaintiffs also agreed to a covenant not to sue, providing that they would not

seek personal equitable or monetary relief by filing, charging, claiming, suing or causing or permitting to be filed any civil action, suit or legal proceeding in connection with any matter occurring at any time in the past concerning [the plaintiffs'] employment relationship with Morton, up to and including the date of [the] Agreement or involving any continuing effect or *[sic]* any acts or practices which may have arisen or occurred on or prior to the date of [the] Agreement.

Agreement ¶ 13.

The Agreement further provides:

[Each plaintiff] acknowledges that he is acting of his own free will, that he has been advised by Morton to consult an attorney of his choice, that he has had a sufficient opportunity to read the terms of this Agreement, and consult legal counsel, if desired, and that he fully understands all of the provisions of this Agreement. In addition, [each plaintiff] acknowledges that neither Morton nor any of its employees, agents, representatives or attorneys have made any representations concerning the terms of this Agreement other than those contained herein.

Agreement ¶ 19.

Finally, the Agreement also includes an integration provision, which states that "This Agreement contains the entire agreement of the parties relating to the subject matter herein" and that "[i]t may be changed only by a written agreement, signed by both parties." Agreement ¶ 22.

Armstrong and Pottle were given 45 days in which to consider the Agreement before signing it, but they expressly waived that right in writing in order to receive their severance checks more quickly. After their resignations, plaintiffs invested in shop space and tools in order to begin handling the outsourced work of Rohm and Haas. During the first few months after plaintiffs' termination, Rohm and Haas gave them a small amount of work and assured them that it was all the work that was available due to a decrease in production. That trend continued into late 2001 when Pottle accepted a job with Chand Associates due to the lack of work in his new business. Upon commencement of his new position, Pottle discovered that Rohm and Haas was still outsourcing large amounts of grinding work to Chand. When he and Armstrong confronted Payne with that information, Payne denied that Chand was getting the work.

Based on those facts, the plaintiffs filed a complaint in the Superior Court on July 24, 2003, alleging claims of: (1) fraudulent inducement, (2) fraud, (3) breach of oral contract, (4) promissory estoppel, and (5) violation of Mass. Gen. Laws ch. 93A. On November 10, 2003, Rohm and Haas removed the action to this court and, on November 13, filed the pending motion to dismiss for failure to state a claim upon

which relief can be granted under Fed. R.Civ.P. 12(b)(6).

## II. *Standard of Review*

A court may not dismiss a complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6) "unless it appears, beyond doubt, that the [p]laintiff can prove no set of facts in support of his claim which would entitle him to relief." *Judge v. City of Lowell,* 160 F.3d 67, 72 (1st Cir.1998)(quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In considering the merits of a motion to dismiss, the court may look only to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint, and matters of which judicial notice can be taken. *Nollet v. Justices of the Trial Court of Mass.,* 83 F.Supp.2d 204, 208 (D.Mass.2000) *aff'd,* 248 F.3d 1127 (1st Cir.2000). Furthermore, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Langadinos v. American Airlines, Inc.,* 199 F.3d 68, 69 (1st Cir.2000).

## III. *Analysis*

The gravamen of the plaintiffs' complaint is that they were fraudulently induced to terminate their employment voluntarily, accept a severance package, and start their own business in exchange for defendant's promise to provide them with "all of the [outsourced grinding] work they could handle"—a promise that the company never intended to keep, and in any event did not keep.

Defendant contends that the entire matter is controlled by the Agreement signed by the plaintiffs when they left the company, which contains a release, a covenant not to sue, and an integration provision. That Agreement, however, is not as sweeping as defendant contends. Moreover,

plaintiffs have specifically alleged that they were fraudulently induced to enter into the Agreement, which would preclude summary judgment if plaintiffs can establish that they reasonably relied on the alleged misrepresentation.

Nonetheless, plaintiffs' claim cannot survive even if plaintiffs can avoid the operation of the Agreement. Although plaintiffs allege a variety of different theories of recovery, their claim is ultimately dependent on a single issue: whether the alleged agreement to provide "all of the work they could handle" is legally enforceable. For the reasons set forth below, this Court concludes that it is not.

Because that promise is not enforceable, plaintiffs cannot prevail on the contract claim. Their claims of fraud and fraudulent inducement, by which they seek to avoid the effect of the Agreement, likewise fail, because plaintiffs cannot establish reasonable reliance where the promise at issue was too vague to be enforced. The claim for promissory estoppel fails on similar grounds. Finally, plaintiffs have failed to state a claim for violation of Mass. Gen. Laws ch. 93A because the instant dispute arose during the parties' employment relationship.

### A. *The Effect of the Agreement and Release*

 As a threshold matter, defendant contends that the complaint should be dismissed in its entirety because the Agreement contains (1) a release of all claims arising out of plaintiffs' employment with and separation from the company, (2) a related covenant not to sue, and (3) an integration provision that specifically provides that there are no other agreements between the parties.

The language contained in the Agreement, however, is neither as comprehen-

sive nor as clear as claimed by defendant. Paragraph 12 of the Agreement releases those claims that plaintiffs had "from the beginning of time until the present, arising out of or in any manner relating to all events and circumstances in any way related to [their] employment with Morton ... or the separation of that employment." It thus does not, by its express terms, release future claims, i.e., those that have not yet accrued.[4] Put another way, while the alleged oral contract certainly arises out of and relates to plaintiffs' employment with Morton, as of the moment the release was signed, plaintiffs had no claim under that contract, because no breach had yet occurred.

The covenant not to sue, in turn, provides that plaintiffs will not file suit "in connection with any matter occurring at any time in the past concerning [the plaintiffs'] employment relationship with Morton, up to and including the date of [the] Agreement or involving any continuing effect or [*sic*; probably should be *of*] any acts or practices which may have arisen or occurred on or prior to the date of [the] Agreement." Again, that language would not appear to preclude a suit for a breach of contract that occurred after the date of the Agreement; such a breach would not be a "continuing effect" of a prior act or practice, but a new "act" altogether.

As for the integration provision, paragraph 22 states that it "contains the entire agreement of the parties relating to the subject matter herein." The "subject matter herein" is plainly plaintiffs' employment with, and termination from, the company. While that language would create serious hurdles for plaintiffs if they attempted to introduce parol evidence that contradicted the terms of the Agreement, it is less clear that it would prohibit testimony regarding a collateral oral contract.[5] There is at least a possibility that the Court, after receipt and review of evidence, could find that the parties entered into both the written Agreement and a collateral oral contract relating to the outsourcing of work.

■ In any event, plaintiffs seek to avoid the Agreement in its entirety by pleading that they were fraudulently induced to enter into it. It is well-settled that, as a general matter, parties may not use contractual language to avoid a claim of fraud in the inducement. *Bates v. Southgate*, 308 Mass. 170, 182–83, 31 N.E.2d 551 (1941); *see also McEvoy Travel Bureau, Inc. v. Norton Co.*, 408 Mass. 704, 712–13, 563 N.E.2d 188 (1990).

Courts have on occasion carved out narrow exceptions to that rule, where the

---

4. The release could have been drafted in more comprehensive terms, so as to release the company from future claims arising out of contract obligations between it and the plaintiffs existing as of the date of the release. *See Radovsky v. Wexler*, 273 Mass. 254, 257, 173 N.E. 409 (1930) ("An existing obligation or contract right between parties, although executory and in some respects dependent upon contingencies that might never happen, is one that can be released").

5. Under the parol evidence rule, where there is a binding integrated agreement, evidence of prior or contemporaneous agreements or negotiations may not be considered to vary a term of the written agreement. *Brennan v.*

*Carvel*, 929 F.2d 801, 806 (1st Cir.1991). Nevertheless, the parol evidence rule does not exclude proof of a prior oral contract between the parties, which is separate from, or collateral to, and not inconsistent with, the terms of the written agreement. *Id.* ("The 'collateral agreement rule' is well established in Massachusetts"); *see Durkin v. Cobleigh*, 156 Mass. 108, 108–109, 30 N.E. 474 (1892). The fact that an agreement is completely integrated, as the Agreement at issue in this case would appear to be, does not preclude an attempt to show an entirely separate and distinct contract between the same parties. *Brennan*, 929 F.2d at 807.

parties are sophisticated persons or entities represented by counsel, the contract at issue was fully negotiated, and the alleged misrepresentations expressly contradict specific language of the written agreement. *See, e.g., McCartin v. Westlake*, 36 Mass.App.Ct. 221, 230–33, 630 N.E.2d 283 (1994) (rejecting plaintiffs' claims of fraud based on prior oral misrepresentations where the parties' subsequent written agreements were negotiated over a period of more than three months, plaintiffs were represented by counsel, changes were made in the agreements reflecting the understanding of the parties, and the misrepresentations were inconsistent with various provisions of the agreement, including but not limited to the integration clauses therein).[6]

Here, plaintiffs are blue-collar machinists who were not represented by counsel during the contract negotiations; although the record is incomplete, it appears that they had limited education and experience in business affairs and were far from skilled in the art of negotiating contracts. There was apparently little or no negotiation of the terms of the Agreement. Moreover, while the Agreement contains a standard integration provision, that language does not specifically contradict the alleged agreement to give plaintiffs "all the work they could handle." [7]

In sum, plaintiffs are not necessarily precluded by the language of the Agreement from bringing their claims. Nonetheless, theirs is a hollow victory, because

---

6. *See also Plumer v. Luce*, 310 Mass. 789, 791, 802–05, 39 N.E.2d 961 (1942) (rejecting experienced businesswoman's claim that defendant misrepresented what he intended to do with plaintiff's stock where the parties' written contract expressly stated that the defendant had no obligation to use the stock in any particular way); *Turner v. Johnson & Johnson*, 809 F.2d 90, 97–98 (1st Cir.1986) (rejecting plaintiffs' claims of fraud where "both parties were experienced in business and the contract was fully negotiated and voluntarily signed" and defendant's prior oral assertions were inconsistent with a contract provision that "specifically addressed the particular point at issue"). Some courts, although applying the same factors, have analyzed the issue under the rubric of whether plaintiff has established reasonable reliance for the purposes of his fraud claim. *See, e.g., Pizzeria Uno of Kingston, Inc. v. Independence Mall Group*, 1995 WL 419932 at * 6 (Mass.Super.) (no reasonable reliance on alleged fraudulent statements where (1) plaintiffs were sophisticated business people represented by counsel in negotiating the subject leases and (2) the alleged misrepresentations were contradicted by the language of the leases, including the integration clauses therein); *Elias Bros. Rest., Inc. v. Acorn Enter., Inc.*, 831 F.Supp. 920, 923–26 (D.Mass.1993) (no reasonable reliance on plaintiff's prior oral representations where (1) the parties negotiated the subject franchise

agreements over a two-year period during which various provisions were deleted, (2) defendant/counterclaimant had been a party to franchise agreements in the past, and (3) the representations contradicted the language of the integration clause in the agreements).

7. *Compare, e.g., Plumer*, 310 Mass. at 801–05, 39 N.E.2d 961 (alleged oral statements and subsequent written agreement both referred directly to the defendant's use of plaintiff's securities); *McCartin*, 36 Mass.App.Ct. at 225–28, 630 N.E.2d 283 (alleged misrepresentations and subsequent franchise agreement and disclosure statement both referred directly to parties' obligations regarding the franchise arrangement); *Pizzeria Uno*, 1995 WL 419932 at *5–6 (alleged misrepresentations and subsequent lease agreements both referred directly to the parties' obligations under the leases); *Elias Bro. Rest., Inc.*, 831 F.Supp. at 922–26 (alleged misrepresentations and subsequent franchise agreements all referred directly to the parties' obligations regarding the franchise arrangements); *Turner*, 809 F.2d at 95–98 (holding that "plaintiffs may not raise as fraudulent any prior oral assertion inconsistent with a contract provision that specifically addressed a particular point at issue" where defendant's prior statement and subsequent contract both referred directly to the defendant's obligation to market a thermometer).

defendant's alleged promise is too vague to be enforced as a contract or reasonably relied upon as a fraudulent misrepresentation.

## B. *The Alleged Contract*

The alleged contract at issue, as formulated in the complaint, was that "Defendant, through Mr. Payne, promised to provide Plaintiffs with as much outsourced work as they could perform." (Complaint, ¶¶ 27, 32). The question presented is whether that promise is legally enforceable.[8]

■ In order to create an enforceable contract, "[i]t is a necessary requirement that [the] agreement . . . be sufficiently definite to enable the courts to give it an exact meaning." Williston on Contracts § 4:18 (4th ed.1990). While it is not required that parties specify *all* terms of an agreement, they must have "progressed beyond the stage of imperfect negotiation." *Situation Mgmt. Sys., Inc. v. Malouf, Inc.,* 430 Mass. 875, 878, 724 N.E.2d 699 (2000) (internal quotations omitted); *see Lafayette Place Assoc. v. Boston Redevelopment Auth.,* 427 Mass. 509, 517, 694 N.E.2d 820

(1998); *Ross v. Raytheon,* 2001 WL 1455863 at \*4 (Mass.Super.) ("[u]ncertainty is not necessarily fatal to a contract's enforceability" and courts will impute terms into a contract where the parties have specified formulae and procedures that can narrow any uncertainties).[9] Whether an alleged contract is legally enforceable in light of indefinite terms is a question of law for the court. *Ross,* 2001 WL 1455863 at \*4.

■ A lack of definiteness in an agreement might be based on a lack of specificity regarding the time of performance, price to be paid, work to be done, or property to be transferred. *See* Williston at § 4:18. In determining whether such an agreement is nonetheless enforceable, courts should ask whether the parties intended to contract with one another and there is a reasonably certain basis for providing an appropriate remedy. *See id.* (citing the Uniform Commercial Code and the Restatement (Second) of Contracts). That determination varies according to the facts of each case. *See, e.g., Lieberman v. Storagenetworks, Inc.,* 60 Mass.App.Ct. 1118, 2004 WL 360489, at \*2–3 (2004) (un-

8. There is at least some uncertainty as to whether this matter is governed by the Uniform Commercial Code or the common law of contracts. At oral argument, counsel for plaintiff indicated his belief that title to the goods did not pass from defendant to plaintiffs, and therefore the UCC did not apply. *See* Mass. Gen. Laws ch. 106 § 2–106.

9. *See also, e.g.,* Restatement (Second) of Contracts § 33, comment a ("An offer which appears to be indefinite may be given precision by usage of trade or by course of dealing between the parties. Terms maybe supplied by factual implication, and . . . the law often supplies a term in the absence of agreement to the contrary. . . . Where the parties have intended to conclude a bargain, uncertainty as to incidental or collateral matters is seldom fatal to the existence of a contract"); comment d ("Valid contracts are often made which do not specify the time for perform-

ance . . . the time for performance is a 'reasonable time' "); comment e (where parties manifest an intention to be bound and the price is not settled, "the price is a reasonable price at the time of delivery"); comment f (*indefinite terms of minor importance* may be left to what is customary or reasonable); *Barrie v. Quimby,* 206 Mass. 259, 264–265, 92 N.E. 451 (1910) ("It is settled that the general trade usage may be introduced to supply unexpressed terms in a contract . . . If the usage is general as applied to a particular transaction . . . the presumption is that both parties knew of it and contracted accordingly"); *Mass Cash Register, Inc. v. Comtrex Systems Corp.,* 901 F.Supp. 404 417 (D.Mass. 1995) (where an agreement fails to specify a term of duration, the contract will be construed as one "terminable at will by either party upon reasonable notice").

published opinion) (oral promise to grant plaintiff stock options which would vest immediately was too vague and indefinite to be enforced because it did not contain essential terms including the time of vesting or exercise price of the options, terms which the court could not supply "without writing the parties' contract itself"); *Buker v. Nat'l Mgmt. Corp.*, 16 Mass.App.Ct. 36, 42, 448 N.E.2d 1299 (1983) (defendant's oral promise to "work things out" was too vague to constitute the basis of a modified contract); *Held v. Zamparelli*, 13 Mass. App.Ct. 957, 958–59, 431 N.E.2d 961 (1982) (defendant's oral promise to pay plaintiff one-fourth of the profits from leased land if plaintiff would refrain from exercising her option to purchase was silent as to material matters, such as when and how plaintiff's share of the profits was to be calculated and paid and the duration of the agreement, and thus too vague and indefinite to be enforced because "construction and enforcement of the agreement without [such] essential terms would be futile"); *Ross*, 2001 WL 1455863 at *4 (the promise of an unspecified employment position on unspecified terms is "too indefinite and ambiguous to be enforceable as a matter of law"); *compare Lafayette Place Ass.*, 427 Mass. at 518–19, 694 N.E.2d 820 (agreement was enforceable although it failed to provide certain terms such as the precise contract price because it "provided a pricing formula to determine the price to be paid" and created a means for resolving disputes over other details not made specific therein).[10]

Here, defendant's alleged promise is too vague for this Court to ascertain a reasonably certain basis for providing an appropriate remedy. As an initial matter, it is unclear what the volume of work was to be performed—that is, what the parties meant by the phrase "all the work" plaintiffs could "handle." [11] How could this

---

**10.** *See also Smith v. F.W. Morse & Co., Inc.*, 76 F.3d 413, 426–27 (1st Cir.1996) (promises such as "don't worry, we will manage while you are on maternity leave, your job is secure," and "you will assume more responsibilities on your return" are too indefinite to be enforced because they fail to establish the nature of the position plaintiff would assume or her rate of pay, "gaps [which foreclose] a reasonably certain computation of damages"); *Brookhaven Housing Coalition v. Solomon*, 583 F.2d 584, 593–94 (2d Cir.1978) (town's promise to "provide whatever programs would be necessary to meet the housing needs for all federal employees . . ." was unenforceable for lack of specificity); *Zukoski v. Baltimore & Ohio R.R. Co.*, 315 F.2d 622, 624–25 (3d Cir.1963) (defendant's promise that if plaintiff signed a release, he would give him "such employment as would be suitable to his [disabled] condition" was unenforceable because it was so vague and indefinite that nothing certain about it could be formulated); *Laseter v. Pet Dairy Prod. Co.*, 246 F.2d 747, 747–50 (4th Cir.1957) (employer's promise to take care of plaintiff and provide him with "light work" was too vague and indefinite to be enforceable because it contained none of the essential terms of an employment contract including rates of pay, hours of employment, and duration).

**11.** This is phrased in slightly different ways in the complaint. In Paragraph 9, plaintiffs allege that "Mr. Payne represented to Plaintiffs that Defendant would give them 'all the work they could handle' and that Defendant would like to give them all of its outsourced work in ceramic grinding, which had been in the neighborhood of $10,000 per month." Use of the phrase "would like to give" strongly suggests that the company was providing an estimate of probable volume, not a binding agreement with a minimum guaranteed volume.

In Paragraph 20, plaintiffs allege that "Mr. Payne represented to Plaintiffs that Defendant would give them more outsourced work than they could handle and that they would have contracts sufficient to generate a net profit far in excess of what they could make as employees of the Woburn facility." The allegation that defendants would give plaintiffs "more . . . work than they could handle" is not materially different, in this context, from the allegation that defendants would give plaintiffs

court determine what volume of work the two individual plaintiffs could handle? Was it the amount of work typically outsourced from the company to Chand? Was it the amount plaintiffs *wanted* to handle (i.e., did plaintiffs have the power to determine the volume)? Was it the amount that they *actually* could handle, in light of their apparent lack of experience in running a business? Was it an amount they *reasonably* should have been able to handle? What if the amount they could handle changed over time, as they gained experience? What if Morton's needs declined, increased, or fluctuated—how could the court take that into account?

What was the nature and scope of the work? Was it all of the ceramic grinding work of the company?[12] Only that work which had formerly gone to Chand? Was it necessary to meet certain quality standards? Certain delivery times? Both? How could the court determine whether plaintiffs had performed their end of the bargain, that is, whether they had properly "handled" the work?

What price would be paid for the work? Were there different prices for different types of work? When and how would plaintiffs be paid?

What would be the duration of the contract? If it was terminable at will, how can plaintiffs make out a claim for breach? If it was not, what is its term?

Not all of these issues are insurmountable for plaintiff, taken separately. As noted above, the law provides a variety of mechanisms to fill in missing contractual details where appropriate to effectuate the intent of the parties to make a binding agreement. Taken together, however, the omissions are fatal. This Court cannot supply the missing terms without "writing a contract for the parties which they themselves did not make." *Held,* 13 Mass.App. Ct. at 958, 431 N.E.2d 961. Defendant's alleged promise is therefore unenforceable as a matter of law.

It should be obvious that there is not perfect congruence between the result that fairness might seem to dictate and the result dictated by law. The law strongly favors certainty and precision of contracts, even at the expense of occasional injustice, on the theory that a contrary rule would lead to even greater injustices.[13] Thus, the law will refuse to enforce a simple and

"all the work they could handle." While the allegation that plaintiffs would have "contracts sufficient to generate a net profit" is suggestive of a minimum guarantee, it is nonetheless too vague to permit enforcement. The court would have to determine an estimated net profit (presumably, after determining estimated gross sales and estimated expenses) of a business that, by definition, is new and has no history of any kind, and compare it against an estimate of plaintiffs' future pay as employees (including estimated pay raises, bonuses, and overtime) for an indefinite period of time.

12. The complaint does not indicate whether that work was uniform (e.g., the same grinding work was performed on the same type of item) or not (e.g., the work involved different items to be ground or different grinding work

on the same items). If it was not uniform, an entirely new set of variables would be introduced into the equation.

13. Because this issue is framed as a motion to dismiss for failure to state a claim, the court presumes for present purposes that the injustice would work against the plaintiffs. It is certainly possible, of course, that this is not true, and that the company in fact held up its end of the bargain. For example, the complaint alleges that "During the first months after Plaintiffs left Defendant, they were each given a small amount of outsourced work." (Complaint, ¶ 11). It is at least possible that the evidence would show that the company gave some of its outsourced work to plaintiffs, that they were not able to "handle" the work to the company's satisfaction, and that the company thereafter looked elsewhere.

direct promise if it is unduly vague (e.g., "Don't worry, we'll take care of you") but insist on enforcing boilerplate contract language that neither party even read or understood. Of course, a person of principle and character would keep his word; but if his word is sufficiently imprecise, the law will not force him to do so.

In any event, the alleged oral contract here is too imprecise to be enforceable as a matter of law. Plaintiffs' claim for breach of oral contract will be dismissed for failure to state a claim.

## C. *Fraudulent Inducement and Fraud*

■ Plaintiffs have alleged separate counts for fraudulent inducement and fraud. Both claims are similarly premised upon the defendant's allegedly false promise to provide them with all of the work they could "handle" in exchange for plaintiffs' agreement to leave the company and start their own grinding business. Because plaintiffs must establish the same elements to satisfy both claims, both will be treated together.

In order to establish a cause of action for fraud, the plaintiff must show that (1) the defendant made a false representation of material fact, (2) with knowledge of its falsity, (3) for the purpose of inducing the plaintiff to act in reliance thereon, (4) the plaintiff relied upon the representation, and (5) the plaintiff acted to his detriment. *See Reisman v. KPMG Peat Marwick LLP,* 57 Mass.App.Ct. 100, 108–09, 787 N.E.2d 1060 (2003); *see also Turner,* 809 F.2d at 95.[14]

In addition, the plaintiff must show that his reliance on the alleged misrepresentations was reasonable. *See Saxon Theatre Corp. of Boston v. Sage,* 347 Mass. 662, 666–7, 200 N.E.2d 241 (1964); *Elias Bros. Rest., Inc.,* 831 F.Supp. at 922. Reliance is not reasonable where the alleged representations are vague or indefinite. *See Saxon,* 347 Mass. at 666–7, 200 N.E.2d 241 (no reasonable reliance for purposes of plaintiff's claim of deceit where defendant's agreement to construct a theater and lease it to plaintiff "left [so many details] for future negotiations"); *Warren H. Bennett,*

---

**14.** In general, only statements of fact, not statements of opinion, future conditions, or matters promissory in nature, are actionable as fraud. *See Rodowicz v. Massachusetts Mutual Life Ins. Co.,* 192 F.3d 162, 175–76 (1st Cir.1999). A statement that is promissory in nature, however, may be actionable where the defendant misrepresents his actual present intent to perform a future act. *Id.; Bolen v. Paragon Plastics, Inc.,* 754 F.Supp. 221, 226 (D.Mass.1990). Here, plaintiffs specifically claim that "[d]efendant had no intention of honoring [its] promise at the time it was made" and "[d]efendant had full knowledge that Plaintiffs would not get more than a token amount of outsourced work." (Complaint, ¶ 21). Those allegations are plainly sufficient to survive a motion to dismiss as to that element of a fraud claim.

Some courts have suggested that, in order to be actionable, a misrepresentation of actual present intent must contain all essential terms of the parties' alleged agreement. Otherwise,

"it cannot reasonably be said that there is a meaningful intention which can be misrepresented." *Saxon Theatre Corp. of Boston v. Sage,* 347 Mass. 662, 667–68, 200 N.E.2d 241 (1964); *see Stroscio v. Jacobs,* 2 Mass.App.Ct. 827, 827, 310 N.E.2d 383 (1974) (representation that defendants "would rent" their property to plaintiff was "nothing more than an offer to negotiate—a prediction that a mutually agreeable rental agreement or lease would be negotiated" and thus insufficient to provide the basis for an action in deceit); *Roberts v. Robertson,* 1995 WL 419964 at *6 n. 4 (Mass.Super.) (defendants' representations that, at unspecified times, they would make unspecified future payments "were so vague as to constitute at most preliminary negotiations ...." and thus were not actionable under a theory of fraud). That principle is discussed more fully, *infra,* in the context of whether plaintiffs have established the element of reasonable reliance.

*Inc. v. Charlestown Savings Bank,* 3 Mass. App.Ct. 753, 753, 328 N.E.2d 527 (1975) ("no actionable deceit is alleged ... as the representation allegedly relied upon was so indefinite and imprecise as to render such reliance unreasonable as a matter of law").[15]

Whether a statement is too vague or indefinite to induce reasonable reliance depends upon the particular agreement at issue. *See, e.g., Saxon,* 347 Mass. at 666–68, 200 N.E.2d 241 (letter agreement regarding defendant's intent to construct and lease theatre to plaintiff could not provide the basis for reasonable reliance because it included only a general description of the theatre's location and left open for future determination matters such as the exact boundaries of the land to be leased, the rent to be paid in the final ten-year lease period, the precise identities of the lessor and lessee, and the basic plans and specifications of the theatre).

Here, plaintiffs allege that defendant promised them "all the work they could handle" and indicated that the company "would like to" provide them with all of its outsourcing work, amounting to approximately $10,000 per month. Even assuming those statements may constitute an actionable misrepresentation of the company's present intent to provide plaintiffs with work, they are too vague and indefinite to induce reasonable reliance because they fail to include *any* essential terms of an agreement for services. As with the contract claim, the statement leaves a multitude of unanswered questions, including: (1) the volume of work that plaintiffs could "handle"; (2) the nature of the work, (3) the scope of the work, (4) the price to be

paid, and (5) the duration of the contract. Accordingly, plaintiffs cannot establish reasonable reliance and their claims of fraud and fraudulent inducement must be dismissed.

### D. *Promissory Estoppel*

■ In order to establish a claim of promissory estoppel under Massachusetts law, a plaintiff must allege that (1) defendant made a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, (2) the promise does induce such action or forbearance, and (3) injustice can be avoided only by enforcement of the promise. *Neuhoff v. Marvin Lumber and Cedar Co.,* 370 F.3d 197, 203 (1st Cir.2004). As the Massachusetts Supreme Judicial Court has observed, "an action based on reliance is equivalent to a contract action, and the party bringing such an action must prove all the necessary elements of a contract other than consideration." *Rhode Island Hosp. Tr. Nat'l Bank v. Varadian,* 419 Mass. 841, 850, 647 N.E.2d 1174 (1995).

Thus, as with a claim for breach of contract, "[i]n order to establish the existence of an enforceable promise under promissory estoppel, the plaintiff must show that the defendants' promise included enough essential terms so that a contract including them would be capable of being enforced." *LaChance v. Baybank Norfolk,* 1994 WL 878761 at *9 (Mass.Super.) (bank's alleged oral agreement to finance project was unenforceable under the doctrine of promissory estoppel because "its essential terms are incomplete

---

**15.** There is considerable overlap between the case law addressing enforceability of vague agreements as a matter of contract law and that addressing whether statements were too vague to induce reasonable reliance for purposes of proving fraud. *See, e.g., Lieberman,*

60 Mass.App.Ct. 1118, 2004 WL 360489 at *3 (not only were terms of stock option agreement too vague and indefinite to be enforceable as a contract but, "[i]n addition, they [were] too indefinite to serve as a basis for reliance").

and vague" and the alleged promise itself is "too vague to be enforceable"); *see also Baker v. A.W. Chesterton Co.*, 1998 WL 1285612 at *3 (Mass.Super.) (defendant's promise of "secure employment" regardless of his performance in a training course was too vague to be enforceable under the doctrine of promissory estoppel); *Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1124 (1st Cir.1995) ("Inchoate negotiations are no better basis for reliance than for an action on the purported contract as such." (internal quotations omitted)).

As illustrated above, defendant's promise to give plaintiffs "all the work they could handle" is too vague and indefinite to be enforced as a contract. Because, with the exception of consideration, an action based on reliance is equivalent to a contract action, defendant's promise is likewise too vague and indefinite to be enforced under the doctrine of promissory estoppel and plaintiffs' claim will be dismissed.[16]

### E. *Chapter 93A*

■ Finally, plaintiffs assert a claim for violation of Mass. Gen. Laws ch. 93A, § 2, alleging that the company's conduct constitutes an unfair and deceptive act and practice. It is well-settled that Chapter 93A does not apply to "employment contract disputes between employers and the employees who work in the employer's organization, nor to disputes between members of that organization arising out of the employment relationship." *Manning v. Zuckerman*, 388 Mass. 8, 12, 444 N.E.2d 1262 (1983). Rather, such disputes are principally "private in nature" and do not occur in the ordinary "conduct of trade or commerce" as contemplated by the protections of Chapter 93A. *Id.* at 14, 444 N.E.2d 1262. Moreover, "[i]t is without consequence" that the employment relationship no longer exists when the alleged unfair conduct occurred so long as that conduct arose from such relationship. *Informix, Inc. v. Rennell*, 41 Mass.App.Ct. 161, 163–64, 668 N.E.2d 1351 (1996) (holding that Chapter 93A did not apply to post-employment violations by employee of provisions contained in a confidentiality agreement entered into with his employer during his employment); *but see Peggy Lawton Kitchens, Inc. v. Hogan*, 18 Mass.App.Ct. 937, 466 N.E.2d 138, 141 (1984) (defendant's post-employment use of plaintiff's trade secret did violate Chapter 93A).[17]

Here, the plaintiffs allege that the defendant engaged in an unfair and deceptive trade practice under Chapter 93A by "knowingly and willfully induc[ing] [them] to resign in exchange for a false promise of out-sourced work." The alleged promise occurred while plaintiffs were employed at the company and related directly to their employment relationship. Plaintiffs' claim for violation of Chapter 93A, therefore, arose from their employment relationship

---

16. Another element of promissory estoppel is that the party invoking it must have reasonably relied on the alleged promise. *Coll*, 50 F.3d at 1124; *Lieberman*, 60 Mass.App.Ct. 1118, 2004 WL 360489 at * 2–3 (plaintiff's claim of promissory estoppel failed as a matter of law because the terms of the alleged oral stock option agreement, which were silent as to the time of vesting and exercise price, were "too indefinite to serve as a basis for [reasonable] reliance"). As discussed *infra*, plaintiffs have not established reasonable reliance for purposes of their claims of fraud because the defendant's promise is too vague and indefinite. Because reasonable reliance is defined similarly for purposes of claims of fraud and promissory estoppel, *see id.* at 1125 n. 6., plaintiffs' claim of promissory estoppel also will fail on those grounds.

17. The Appeals Court distinguished its decision in *Peggy Lawton* from its decision in *Informix* on the grounds that, in the former, the defendant's theft of trade secrets "was independent of and did not arise from [his] former employment relationship." *Informix*, 41 Mass.App.Ct. at 164 n. 2, 668 N.E.2d 1351.

with defendant and will be dismissed.[18] *See Aggarwal v. Nexabit Networks, Inc.,* 2000 WL 1273359 at *1 (Mass.Super.) (holding that all of plaintiff's claims, including his claim for breach of a proffered severance agreement, "stem from plaintiff's employment relationship ... and are therefore not actionable under G.L. 93A").

### ORDER

For the reasons stated in the foregoing memorandum, plaintiffs have failed to state a claim for which relief can be granted with respect to their claims of fraudulent inducement, fraud, breach of oral contract, promissory estoppel, and violation of Mass. Gen. Laws ch. 93A. Accordingly, defendant's motion to dismiss (Docket No. 3) is GRANTED and plaintiffs' complaint is DISMISSED in its entirety.

**So Ordered.**

---

**18.** If the court were to assume that the alleged promise did not arise out of the employment relationship, then the case becomes a simple contract claim. A mere breach of contract does not amount to a violation of Chapter 93A. *See Whitinsville Plaza, Inc. v. Kotseas,* 378 Mass. 85, 100–01, 390 N.E.2d 243 (1979). Although "conduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes," plaintiffs have failed to allege sufficient facts to support such a theory. *See Anthony's Pier Four, Inc. v. HBC Assoc.,* 411 Mass. 451, 474, 583 N.E.2d 806 (1991).